**RECORD NO. 13-1304**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

### For The District of Columbia Circuit

## MARY V. HARRIS FOUNDATION,

*Appellant*,

**v.**

## FEDERAL COMMUNICATION COMMISSION,

*Appellee*.

## HOLY FAMILY COMMUNICATIONS,

*Intervenor for Respondent*.

ON APPEAL FROM THE
FEDERAL COMMUNICATIONS COMMISSION

———————

PAGE PROOF BRIEF OF APPELLANT

———————

Donald E. Martin
DONALD E. MARTIN, P.C.
Post Office Box 8433
Falls Church, Virginia 22041
(703) 642-2344

*Counsel for Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Appellant Mary V. Harris Foundation hereby submits the following certificate as to parties, rulings under review and related cases.

### A.     Parties

The parties in this case are Appellant Mary V. Harris Foundation ("MVHF") and Appellee Federal Communications Commission ("FCC").  Holy Family Communications, Inc. ("HFC") is an Intervenor in support of Appellee.  MVHF and HFC were the only parties appearing before the agency in the proceeding below.

### B.     Ruling under Review

The ruling under review in this case is the FCC's decision in *Holy Family Communications*, *Inc.*, Memorandum Opinion and Order, 28 FCC Rcd. 4854 (2013) (JA___), *recon. den.*, *Holy Family Communications*, *Inc.*, Order on Reconsideration, 28 FCC Rcd 15687 (2013) (JA___).

### C.     Related Cases

Counsel is unaware of any other cases related to this matter.


By:     /s/ Donald E. Martin
        *Counsel for Appellant*


March 31, 2014

## CORPORATE DISCLOSURE STATEMENT

Appellant Mary V. Harris Foundation is a Nevada nonprofit corporation with its main office in Texas.  No publicly held corporation holds any interest in the Foundation.   The Foundation is the licensee of noncommercial radio stations KFHL, Wasco, California and WHFG, Broussard, Louisiana.  Other nonprofit entities under common control with the Foundation are the licensees of the following radio stations: KASK, Fairfield, California; WBAJ, Blythewood, South Carolin; WTCG, Mount Holly, North Carolina; WSJC, Maggee, Mississippi; and WGTT, Emeralda, Florida.

March 31, 2014                              By:    /s/ Donald E. Martin
                                                   *Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ...............i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF CONTENTS........................................................ iii

TABLE OF AUTHORITIES .....................................................v

GLOSSARY...................................................................xi

JURISDICTION................................................................1

STATEMENT OF ISSUES TO BE RAISED ......................................2

STATUTES AND REGULATIONS.................................................3

STATEMENT OF THE CASE..................................................6

STANDING ................................................................16

SUMMARY OF ARGUMENT ................................................17

STANDARD OF REVIEW ..................................................20

ARGUMENT ...............................................................23

    I.    A Threshold Coverage Formula Based on a Percentage of an Applicant's Service Area Population Violates § 307(b)....................23

        A.    The Percentage Formula is not Efficient ..................................23

        B.    The Percentage Formula is not Fair or Equitable ....................28

II.     The Commission's Denial of Fair Distribution of Service
        Preference On the Basis of Eligibility Benchmarks Should Be
        Set Aside as Required by Section 706 of the Administrative
        Procedure Act ...................................................................................31

III.    Refusal to Waive the Benchmark Eligibility Provision of Rule
        73.7002(b) Was Arbitrary and Capricious and an Abuse of
        Discretion ..........................................................................................38

IV.     The FCC's Adoption of a Two-Tier Eligibility Benchmark as a
        Prior Condition to Evaluating Applicants under the Fair
        Distribution of Service Criterion Violated the APA ..........................41

        A.      The NCE Comparative Standards Rulemaking Record
                Demonstrates the Lack of Opportunity for Interested
                Parties to File Meaningful Comments with Respect to the
                Commission's Ultimate Change of Policy................................44

        B.      The Commission Violated the Notice and Comment
                Requirements of Section 553(b) of the Administrative
                Procedure Act in Promulgating the Final Version of Rule
                73.7002 ...................................................................................48

CONCLUSION ........................................................................................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Iron & Steel Inst. v. EPA*,
    568 F.2d 284 (3d Cir. 1977) ...........................................................45

*American Family Association et al. v. FCC*,
    365 F.3d 1156 (D.C. Cir. 2004) ....................................................54

*American Frozen Food, Institute v. Train*,
    539 F.2d 107 (D.C. Cir. 1976).......................................................52

*American Water Works Ass'n v. EPA*,
    40 F.3d 1266 (D.C. Cir. 1994).......................................................45

*Basf Wyandotte Corp., v. M. Costle E.I. duPont Nemours & Co*,
    598 F.2d 637 (1st Cir. 1979).........................................................52

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*,
    419 U.S. 281 (1974).....................................................................21

*Brown v. Jordan*,
    513 U.S. 115 (1994).....................................................................20

*Chevron U.S.A., Inc. v. Natural Res. Def. Counsel, Inc.*,
    467 U.S. 837 (1984)...............................................................20, 21

*Council Tree Communications, Inc. v. FCC*,
    619 F.3d 235 (3d Cir. 2010) ....................................................46, 51

*FCC v. Allentown Broadcasting Corp.*,
    349 U.S. 358 (1955).....................................................................42

*Greater Boston Television Corp., v. FCC*,
    444 F.2d 841 (D.C. Cir. 1970)................................................35, 36

*Chief Authorities are Designated by an Asterisk*

*Home Box Office*, *Inc. v. FCC*,
    567 F.2d 9 (D.C. Cir. 1977)...........................................................46

*Int'l Union*, *United Mine Workers of Am. v. Mine Safety & Health Admin.*,
    407 F.3d 1250 (D.C. Cir. 2005)....................................................45

*King v. St. Vincent's Hospital*,
    502 U.S. 215 (1991)......................................................................20

*Loyola University v. FCC*,
    670 F.2d 1222 (D.C. Cir. 1982)....................................................24

*Martini v. Fed. Nat'l Mortgage Ass'n.*,
    178 F.3d 1336 (D.C. Cir. 1999), *cert. dismissed*,
    120 S. Ct. 1155 (2000)..................................................................20

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)..................................................................31, 32

*McLouth Steel Products Corp. v. Thomas*,
    838 F.2d 1317 (D.C. Cir. 1988)....................................................45

*Michigan Public Power Agency v. FERC*,
    405 F.3d 8 (D.C. Cir. 2005)..........................................................36

*\*Motor Vehicle Manufacturers Ass'n of the U.S.*, *Inc.*, *et al. v.
State Farm Mutual Automobile Insurance Co.*, *et al.*,
    463 U.S. 29 (1983)............................................................21, 32, 36

*Natural Res. Def. Council v. EPA*,
    279 F.3d 1180 (9th Cir. 2002) ......................................................45

*Network IP*, *LLC v. FCC*,
    548 F.3d 116 (D.C. Cir. 2008).......................................................40

*New South Broadcasting Corporation v. FCC*,
    879 F.2d 867 (D.C. Cir. 1989).......................................................44

*Northeast Cellular Telephone Co. v. FCC*,
    897 F.2d 1164 (D.C. Cir. 1990).....................................................40

*Pasadena Broadcasting Co. v. FCC*,
    555 F.2d 1046 (D.C. Cir. 1977)...................................................................42

*Prometheus Project v. FCC*,
    373 F.3d 372 (3d Cir. 2004) .......................................................................45

*Prometheus Radio Project v. FCC*,
    652 F.3d 431 (3d Cir. 2011) ..........................................................44, 45, 46

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)........................................................................21, 22, 32

*Shell Oil Co. v. EPA*,
    950 F.2d 741 (D.C. Cir. 1991)....................................................................51

*U.S. Telecom Ass'n v. FCC*,
    227 F.3d 450 (D.C. Cir. 2000)....................................................................21

*Verizon v. FCC*,
    No. 11-1355 (D.C. Cir. Jan. 14, 2014) .......................................................33

*\*WAIT Radio v. FCC*,
    418 F.2d 1153 (D.C. Cir. 1969)............................................................39, 40

## STATUTES

5 U.S.C. § 551 *et seq.*...................................................................................31

5 U.S.C. § 553.............................................................................32, 33, 43, 44

5 U.S.C. § 553(b) .........................................................................................48

5 U.S.C. § 706........................................................................................31, 33

5 U.S.C. § 706(2) .........................................................................................21

5 U.S.C. § 706(b) .........................................................................................32

5 U.S.C. § 706(b)(2)(A) .........................................................................32, 33

5 U.S.C. § 706(b)(2)(D) ........................................................................32, 33

47 U.S.C. § 307(b) .................. 2, 3, 7, 11, 13, 14, 15, 18, 23, 24, 26, 27, 28, 29, 30,
31, 32, 34, 35, 36, 37, 41, 42, 43, 44, 48, 52, 55

47 U.S.C. § 402(b)(1) ...................................................................................1

## REGULATIONS

47 C.F.R. § 1.3 ...........................................................................................40

47 C.F.R. § 73.7002 ............................................... 2, 3, 4, 7, 14, 19, 32, 35, 36, 37,
38, 41, 48, 49, 51, 54, 55

47 C.F.R. § 73.7002(b) .................................................................35, 38, 43, 46

## OTHER AUTHORITIES

*Alkima Broadcasting Co.*,
44 FCC 2689 (1961) .........................................................................23

*Camel Co.*,
14 FCC 2d 919 (1968) .......................................................................23

*Carnegie-Mellon Student Government Corporation*, Hearing Designation Order,
7 FCC Rcd 3914 (MB 1992) ............................................................26

*Comparative Consideration of 76 Groups of Mutually Exclusive Applications for Permits to Construct New or Modified Noncommercial Educational FM Stations*, Memorandum Opinion and Order,
22 FCC Rcd 6101 (2007)..........................................................13, 28, 39

*Competitive Bidding*,
13 FCC Rcd 15920 (1998)...........................................................24, 27, 42

*Debra Carrigan*,
100 FCC 2d 721 (Rev. Bd. 1985) ................................................30

*Holy Family Communications*, *Inc.*, Memorandum Opinion and Order,
    26 FCC Rcd 12791 (MB 2011) ....................................................................14

*Holy Family Communications*, *Inc.*, Memorandum Opinion and Order,
28 FCC Rcd 4854 (2013), *recon. den.*,
*Holy Family Communications*, *Inc.*, Order on Reconsideration,
    28 FCC Rcd 15687 (2013).....................................................................1, 15

*Mary V. Harris Foundation*, Letter Decision,
    22 FCC Rcd 18931 (MB 2007) ......................................................14, 30, 39

*New FM*, *Avondale*, *Colorado*,
    28 FCC Rcd 5667 (MB 2013) ...................................................................25

*New York University*,
    10 RR 2d 215 (1967) ................................................................................26

*Non-commercial Educational FM Broadcast Applications Accepted for
Filing and Notification of Cut-off Date*, Report No. A-311, released April
16, 1997...........................................................................................................6

*Policies to Promote Rural Radio Service and to Streamline Allotment and
Assignment Procedures*, Second Report and Order, First Order on
Reconsideration, and Second Further Notice of Proposed Rulemaking,
    26 FCC Rcd 2556 (2011)..........................................................................25

Public Notice, *Deadline for NCE Settlements and Supplements Extended to
July 19, 2001*,
    16 FCC Rcd 10892 (MB 2001) ...............................................................10

Public Notice, *FCC Freezes Comparative Hearings*,
9 FCC Rcd 1055 (1994), *modified* 9 FCC Rcd 6689 (1994),
*further modified*, 10 FCC Rcd 2877 (1995),
    10 FCC Rcd. 12182 (1995).........................................................................6

Public Notice, *Supplements and Settlements to Pending Closed Groups of
Noncommercial Educational Broadcast Applications Due by June 4, 2001*,
    16 FCC Rcd 6893 (MB 2001) .............................................................10, 29

*Reeamination of Comparative Standards for Noncommercial Educational Applications*, Notice of Proposed Rulemaking,
  10 FCC Rcd 2877 (1995).........................................................................47, 49

*Reexamination of Comparative Standards for Noncommercial Educational Applications*, Report and Order,
15 FCC Rcd 7386 (2000), *affirmed and clarified*,
Memorandum Opinion and Order, 16 FCC Rcd 5074 (2001),
*recon. denied*, Memorandum Opinion and Second Order on Reconsideration,
17 FCC Rcd 13132 (2002), *aff'd sub nom*,
*American Family Association v. FCC*,
365 F.3d 1156 (D.C. Cir. 2004), *cert denied*,
  543 U.S. 1004 (2004) ...........................................................................7, 8, 9

*Reexamination of Comparative Standards for Noncommercial Educational Applications*, Memorandum Opinion and Order,
  16 FCC Rcd 5074 (2001).........................................................................9, 10

*Reexamination of Comparative Standards for Noncommercial Educational Applications*, Report and Order,
  15 FCC Rcd 7386 (2000)........................................... 7, 8, 11, 26, 27, 29, 30,
    31, 34, 41, 42, 47, 48, 50

*Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Further Notice of Proposed Rulemaking,
  13 FCC Rcd 21167 (1998).........................................................43, 47, 49, 50

*Revision of FM Assignment Policies and Procedures*,
  90 FCC 2d 88 (1982) ..................................................................................24

# GLOSSARY

| | |
|---|---|
| § 307(b) | Section 307(b) of the Communications Act of 1934, as amended.  47 U.S.C. § 307(b). |
| 60 dBu Contour | The signal field strength contour around an FM transmitter, the area within which is deemed to be the station's primary service area and within which the station's signal is protected from harmful interference.  Also sometimes identified as the 1 mV/m contour. |
| "A/B" Cut-off | Under the prior regime for processing NCE applications, shortly after filing, an application was published on an "A" cut-off list.  The public notice included a deadline (the "A" cut-off date) by which would-be competitors must file any application mutually exclusive with applications on the list.  All such applications were protected from new competitors as of the "A" cut-off date. The new applications were thereafter published on a "B" cut-off list with a "B" cut-off date, the deadline for petitions to deny and for amendments as a matter or right. All proposals were frozen for comparative purposes as of the "B" cut-off date. |
| APA | Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* |
| FCC | Federal Communications Commission |
| *Letter Decision* | *Mary V. Harris Foundation*, Letter Decision, 22 FCC Rcd 18931 (pursuant to which the Media Bureau dismissed Appellant's application and granted Intervenor's application). |
| NCE | Noncommercial educational, as in broadcast stations specially licensed by the FCC to be noncommercial educational stations.  *See* 47 C.F.R. § 73.501 and § 73.621. |

| | |
|---|---|
| *NCE Order* | *Reexamination of Comparative Standards for Noncommercial Educational Applications*, Report and Order, 15 FCC Rcd 7386 (2000). |
| *NCE MO&O* | *Reexamination of Comparative Standards for Noncommercial Educational Applications*, Memorandum Opinion and Order, 16 FCC Rcd 5074 (2001). |
| Tentative Selectee | The applicant in a group of mutually exclusive noncommercial broadcast applicants tentatively chosen as the winning applicant by the FCC upon initial comparative analysis. |

## JURISDICTION

This case is before the Court on the appeal the Mary V. Harris Foundation from a final order by the Federal Communications Commission dismissing the Foundation's application for a new FM broadcast construction permit at Williamsville, New York.  *See*, *Holy Family Communications*, *Inc.*, Memorandum Opinion and Order, 28 FCC Rcd 4854 (2013) (JA___), *recon. den.*, *Holy Family Communications*, *Inc.*, Order on Reconsideration, 28 FCC Rcd 15687 (2013) (JA___).  The FCC's Order on Reconsideration was released on November 13, 2013.  The Foundation timely filed a Notice of Appeal with this Court on December 13, 2013.  This Court has jurisdiction over this matter pursuant to 47 U.S.C. § 402(b)(1).

## STATEMENT OF ISSUES TO BE RAISED

(1) Whether FCC Rule § 73.7002 is contrary to § 307(b) of the Communications Act of 1934 as amended.

(2) Whether the FCC's adoption of the percentage formula for a decisive preference under the Fair Distribution of Service NCE comparative selection criterion was arbitrary and capricious.

(3) Whether the FCC's denial of Appellant's request for a waiver of the 10% threshold eligibility benchmark in FCC Rule § 73.7002 was arbitrary and capricious.

(4) Whether the manner in which the FCC adopted the Fair Distribution of Service criteria in Rule § 73.7002 violated the notice and comment provisions of the Administrative Procedure Act.

## STATUTES AND REGULATIONS

**47 U.S.C. § 307(b)**

**United States Code**
**Title 47.  Telecommunications**
**Chapter 5.  Wire or Radio Communication**
**Special Provisions Relating to Radio**

**§ 307.  Licenses.**

  **\* \* \***

  (b)  Allocation of facilities. In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.

  **\* \* \***

**47 C.F.R. § 73.7002**

**Code of Federal Regulations**
**Title 47.  Telecommunication**
**Chapter 1.  Federal Communications Commission**
**Subchapter C.  Broadcast Radio Services**

**Part 73.  Radio Broadcast Services**

  **Subpart K.  Application and Selection Procedures for Reserved Noncommercial Educational Channels, and for Certain Applications for Noncommercial Educational Stations on Non-Reserved Channels**

3

**§ 73.7002 Fair distribution of service on reserved band FM channels.**

(a)  If timely filed applications for full service stations on reserved FM channels are determined to be mutually exclusive, and will serve different communities, the Commission will first determine, as a threshold issue, whether grant of a particular application would substantially further the fair distribution of service goals enunciated in section 307(b) of the Communications Act, 47 U.S.C. § 307(b).

(b)  In an analysis performed pursuant to paragraph (a) of this section, a full-service FM applicant that identifies itself as a Tribal Applicant, that proposes Tribal Coverage, and that proposes the first reserved channel NCE service owned by any Tribal Applicant at a community of license located on Tribal Lands, will be awarded a construction permit. If two or more full-service FM applicants identify themselves as Tribal Applicants and meet the above criteria, the applicant providing the most people with reserved channel NCE service to Tribal Lands will be awarded a construction permit, regardless of the magnitude of the superior service or the populations of the communities of license proposed, if different. If two or more full-service FM applicants identifying themselves as Tribal Applicants each meet the above criteria and propose identical levels of NCE aural service to Tribal Lands, only those applicants shall proceed to be considered together in a point system analysis. In an analysis performed pursuant to paragraph (a) of this section that does not include a Tribal Applicant, a full service FM applicant that will provide the first or second reserved channel noncommercial educational (NCE) aural signal received by at least 10% of the population within the station's 60dBu (1mV/m) service contours will be considered to substantially further fair distribution of service goals and to be superior to mutually exclusive applicants not proposing that level of service, provided that such service to fewer than 2,000 people will be considered insignificant. First service to 2,000 or more people will be considered superior to second service to a population of any size. If only one applicant will provide such first or second service, that applicant will be selected as a threshold matter. If more than one applicant will provide an equivalent level (first or second) of NCE aural service, the size of the population to receive such service from

4

the mutually exclusive applicants will be compared. The applicant providing the most people with the highest level of service will be awarded a construction permit, if it will provide such service to 5,000 or more people than the next best applicant. If none of the applicants in a mutually exclusive group would substantially further fair distribution goals, all applicants will proceed to examination under a point system. If two or more applicants will provide the same level of service to an equivalent number of people (differing by less than 5,000), only those equivalent applicants will be considered together in a point system.

(c)  For a period of four years of on-air operations, an applicant receiving a decisive preference pursuant to this section is required to construct and operate technical facilities substantially as proposed and shall not downgrade service to the area on which the preference was based. Additionally, for a period beginning from the award of a construction permit through four years of on-air operations, a Tribal Applicant receiving a decisive preference pursuant to this section may not:

> (1)  Assign or transfer the authorization except to another party that qualifies as a Tribal Applicant;
> (2)  Change the facility's community of license; or
> (3)  Effect a technical change that would cause the facility to provide less than full Tribal Coverage.

## STATEMENT OF THE CASE

This case concerns the FCC's treatment to two mutually exclusive applications for new noncommercial educational ("NCE") FM stations.  In September, 1996, Intervenor Holy Family Communications, Inc. ("HFC") filed its application for a new station at Lancaster, New York.  The application was accepted for filing and assigned an "A" cut-off date.[1]  Appellant Mary V. Harris Foundation ("MVHF") submitted its application on Mary 16, 1997 for a new station at Williamsville, New York.  Although the Commission was still accepting noncommercial broadcast applications under its old regime of "A" and "B" cut-off lists, the processing of mutually exclusive groups of applications had been frozen while the agency reconsidered its procedures for selecting winning applicants by way of comparative hearings.[2]  Consequently, aside from some jockeying related to compliance with spacing rules, the parties' applications sat moribund in the Commission's files for several years.

---

[1]  "A" Cut-off List, *Non-commercial Educational FM Broadcast Applications Accepted for Filing and Notification of Cut-off Date*, Report No. A-311, released April 16, 1997 (JA___).

[2]  Public Notice, *FCC Freezes Comparative Hearings*, 9 FCC Rcd 1055 (1994), *modified* 9 FCC Rcd 6689 (1994), *further modified*, 10 FCC Rcd 2877, 2879 (1995); 10 FCC Rcd 12182 (1995).

6

In 2000, the Commission adopted a *Report and Order* (the *NCE Order*)[3] in its rulemaking proceeding concerning the NCE comparative selection process. It established a new noncommercial comparative selection system based on paper showings rather than hearings before an administrative law judge. A point system was developed that awarded points to competing applicants for qualities deemed to be desirable in an NCE licensee. However, before mutually exclusive applications are evaluated for comparative points, they undergo a threshold analysis for a criterion known as the Fair Distribution of Service. *NCE Order*, 11 FCC Rcd at 7397. The Commission intended that this element of the NCE FM comparative selection process would implement the mandate of § 307(b) of the Communications Act of 1934[4] which requires the FCC to distribute radio facilities "among the several States and communities as to provide a fair, efficient and equitable distribution of radio service to each of the same." This new provision is codified in FCC Rule § 73.7002.[5]

---

[3] *Reexamination of Comparative Standards for Noncommercial Educational Applications*, Report and Order, 15 FCC Rcd 7386 (2000), *affirmed and clarified*, Memorandum Opinion and Order, 16 FCC Rcd 5074 (2001), *recon. denied*, Memorandum Opinion and Second Order on Reconsideration, 17 FCC Rcd 13132 (2002), *aff'd sub nom*, *American Family Association v. FCC*, 365 F.3d 1156 (D.C. Cir. 2004), *cert denied*, 543 U.S. 1004 (2004) (JA ___).

[4] 47 U.S.C. § 307(b).

[5] 47 C.F.R. § 73.7002.

7

The Fair Distribution of Service criterion is used only in situations where the applicants have proposed different communities of license.  For full-service non-Tribal FM applicants, a decisive preference is awarded to an applicant that proposes to provide the first or second reserved channel NCE aural signal to at least 10% of the population within the proposed 60 dBu contour.[6]  Nevertheless, if the population to receive that first or second NCE signal is less than 2,000 persons, the coverage is deemed insignificant and this comparative criterion will not be triggered.  First service to 2,000 or more people will be considered superior to second service to a population of any size.  If more than one applicant in a mutually exclusive group meets this threshold, the applicant proposing first and second service to the largest number of people will prevail, provided the margin between that applicant and the next lower applicant is at least 5,000 persons. Where the difference in such coverage is less than 5,000 people, the applicants are considered equal under the First Distribution of Service criterion and they are then compared on points.

While the *NCE Order* adopted the basic framework of the new comparative selection rules, it did not terminate the processing freeze.  The applicants maintained their static positions.  Approximately ten months later, in February,

_____

[6] The Tribal applicant rules do not pertain to the applicants in this case because neither of them is a Tribal applicant.

8

2001, the Commission released a *Memorandum Opinion and Order* (the *NCE MO&O*)[7] to clarify its new policies and to set procedural guidelines.  In place of accepting applications for new stations on a rolling on-demand basis, a filing window system was established to limit the filing of applications for new stations and major changes to existing stations to occasional brief periods of time called "filing windows."  The *NCE MO&O* also sorted some 200 pending NCE FM applications into "open" and "closed" mutually exclusive groups.  "Open" groups were composed of applications that had not yet passed an "A" cut-off date under the previous processing system.  Applications on an "A" cut-off list would be susceptible to competing applications until the "A" cut-off date.  Applications in open groups would be required to remain pending through the first filing window as that would be the opportunity for would-be competitors to submit applications. On the other hand, applications that had already passed an "A" cut-date or that had been filed to compete with an application on an "A" cut-off list were said to be in "closed" groups.  These groups were closed to new applicants and were ready to commence the comparative selection process.  The applications of MVHF and

---

[7] *Reexamination of Comparative Standards for Noncommercial Educational Applications*, Memorandum Opinion and Order, 16 FCC Rcd 5074 (2001) (subsequent history omitted) (JA___).

9

HFC were listed as the only two applications in a closed mutually exclusive group identified as MX Group No. 960908.[8]

The new NCE comparative selection process relied on data about the applicants and their applications which, for the most part, had never before been required to be included in an application.  Consequently it was necessary to require all of the applicants with applications filed before the processing freeze under the old system to amend their applications so as to provide the information that would be relevant to the new comparative selection process.  The deadline for filing such amendments – called "Point Supplements" – was set for June 4, 2001.[9] That date was also selected as the "snapshot" date – the date on which the applicants' data would be frozen for comparative purposes.[10]  Applicants were permitted to amend the non-technical portions of their applications on or before the snapshot date to revise outdated information and to furnish information required for comparative analysis.  Population data for coverage statistics was to

---

[8] *NCE MO&O*, 16 FCC Rcd at 5191 (JA___).

[9] Public Notice, *Supplements and Settlements to Pending Closed Groups of Noncommercial Educational Broadcast Applications Due by June 4, 2001*, 16 FCC Rcd 6893 (MB 2001) (JA___).

[10] The filing deadline for the Point Supplements was later postponed until July 19, 2001.  However, the "snapshot" date for the accuracy and currency of the data remained June 4, 2001.  Public Notice, *Deadline for NCE Settlements and Supplements Extended to July 19, 2001*, 16 FCC Rcd 10892 (MB 2001).

10

be current as of the 2000 census.  However, as for the precise geographic area to be covered, the technical proposals themselves were frozen as of the earlier of the application's "B" cut-off date (if the application been on a "B" cut-off list) or April 21, 2000, the date on which the *NCE Order* was released.

This sequence of events and noteworthy dates had a substantial impact on MVHF's case.  MVHF prepared and filed its application in 1997 when the comparative selection regime in effect included "A" and "B" cut-off lists and traditional comparative hearings.  The noncommercial comparative hearings of the era before the adoption of the *NCE Order* did consider whether an applicant's proposal provided a new NCE aural service to any area or population that was deemed to be lacking adequate NCE service.  However, there was no minimum threshold value that had to be covered.  The landscape changed with the adoption of the *NCE Order*, but MVHF had no opportunity to remold its application so as to address the new comparative criteria in the new selection process – especially with respect to the parameters of its proposed coverage area.  That coverage area was frozen on April 21, 2000 – the same day that the new rules were first made public.

In response to the Commission's call for Point Supplement amendments, MVHF and HFC both timely amended their applications to provide comparative data.  In addition to information relevant to the point analysis for non-307(b)

11

issues, they submitted population data about their respective applications as shown

on the following chart:

| | MVHF[11] | HFC[12] |
|---|---|---|
| Total population within 60 dBu contour | 300,673 | 88,434 |
| Population to receive first NCE service | 0 | 0 |
| Population to receive second NCE service | 28,453 | 4,886 |
| Percentage of total population within 60 dBu contour to receive first or second NCE service | 9.46% | 5.53% |

These figures have been accepted and have been uncontested throughout the

proceeding at the Commission as the respective valid population coverage

statistics for these applicants.

After the snapshot date and the filing of the Point Supplement amendments

in the summer of 2001, there followed another long period of inaction for the two

applications in this case.  Nearly six years later, the Commission finally

---

[11] *See* Application of Mary V. Harris Foundation, FCC File No. BPED-19970516MA, Point Supplement Amendment, filed July 19, 2001 (JA ___).

[12] *See* Application of Holy Family Communications, Inc., FCC File No. BPED-19960920MA, Point Supplement Amendment, filed July 19, 2001 (JA ___).

announced the results of its comparative analysis of MX Group No. 960908 in

another *Memorandum Opinion and Order* with 75 other mutually exclusive

groups (the *Omnibus Order*).[13]  Relying on the uncontested population coverage

data supplied by the applicants in their Point Supplement amendments, the

Commission found that neither applicant proposed to provide first or second NCE

service to at least 10% of the population within its 60 dBu contour.  The agency

therefore concluded that neither applicant was entitled to the decisive § 307(b)

preference.  Upon consideration of the comparative factors for which points could

be awarded, HFC was awarded five points and MVHF earned two points.  HFC

was named the Tentative Selectee.  This action by the Commission triggered the

commencement of a 30-day period for submitting petitions to deny the Tentative

Selectee's application.[14]

MVHF timely filed a Petition to Deny HFC's application.[15]  MVHF

asserted, *inter alia*, that it should have been the preferred applicant under the Fair

Distribution of Service criterion and MVHF should have been named the

---

[13] *Comparative Consideration of 76 Groups of Mutually Exclusive Applications for Permits to Construct New or Modified Noncommercial Educational FM Stations*, Memorandum Opinion and Order, 22 FCC Rcd 6101 (2007) (the *Omnibus Order*) (JA ___).

[14] *Omnibus Order*, 22 FCC Rcd at 6135-6136, 6167 (JA ___).

[15] Mary V. Harris Foundation Petition to Deny Application of Holy Family Communications, Inc., filed May 2, 2007 (JA ___).

Tentative Selectee in lieu of HFC.  MVHF argued that because its proposal would

provide a new NCE service to much greater numbers of underserved people, its

application should receive the decisive § 307(b) preference.  Acknowledging that

its proposal did not quite meet the 10% benchmark in terms of the proportion of

the total population in its service area to receive a first or second NCE signal,

MVHF requested a waiver of the precise formula for the § 307(b) preference in

Rule 73.7002 of the Commission's rules.[16]  The Commission's Media Bureau

denied the Petition to Deny, granted HFC's application and dismissed MVHF's

application.[17]

MVHF timely sought reconsideration of the Media Bureau's *Letter

Decision.*[18]  The Media Bureau rejected MVHF's request and affirmed its earlier

decision to grant HFC's application.[19]  MVHF duly filed an Application for

Review,[20] which the Commission denied with no discussion of MVHF's claims

---

[16] *Id.*, at 5 (JA ___).

[17] *Mary V. Harris Foundation*, Letter Decision, 22 FCC Rcd 18931, 18938-18939 (MB 2007) (JA ___) (hereinafter, the *Letter Decision*).

[18] Mary V. Harris Foundation Petition for Reconsideration, filed November 26, 2007 (JA ___).

[19] *Holy Family Communications*, *Inc.*, Memorandum Opinion and Order, 26 FCC Rcd 12791 (MB 2011) (JA ___).

[20] Mary V. Harris Foundation Application for Review, filed October 11, 2011 (JA ___).

14

concerning the § 307(b) issue.[21]  MVHF persisted with a timely Petition for Reconsideration.[22]  Acting pursuant to delegated authority, the Media Bureau dismissed MVHF's Petition for Reconsideration on behalf of the Commission.[23]

Having exhausted its administrative remedies, MVHF has appealed the Commission's dismissal of its application to this court.

---

[21] *Holy Family Communications*, *Inc.*, 28 FCC Rcd 4854 (2013) (JA ___).

[22] Mary V. Harris Foundation Petition for Reconsideration, filed May 2, 2013 (JA ___).

[23] *Holy Family Communications*, *Inc.*, Order on Reconsideration, 28 FCC Rcd 15687 (MD 2013) (JA ___).

**STANDING**

Mary V. Harris has standing to pursue this appeal by virtue of the final order of the Federal Communications Commission dismissing its application for a new FM broadcast construction permit at Williamsville, New York.

## SUMMARY OF ARGUMENT

While MVHF's and HFC's mutually exclusive applications for new noncommercial FM broadcast stations in the greater Buffalo area were pending, the FCC changed the rules by which winning applicants are selected from groups of noncommercial broadcast applicants.  Although the FCC conducted a rulemaking proceeding to consider new rules, the specific regulations that it adopted were not announced in an advance public notice with an opportunity for comment.  Consequently, the Commission process for adopting the news did not comply with the notice and comment provisions of the Administrative Procedure Act, and therefore should be vacated.

The new regulations included a two-part formula for determining whether an applicant should have a decisive preference under the Fair Distribution of Service criterion.  An FM applicant is entitled to that preference if it is providing a new NCE signal to at least 2000 people in its primary service area who do not already receive at least two NCE radio signals, and if that underserved group constitutes at least 10% of the total population within the proposed service area.

Evaluated under this formula, MVHF's application fell just short of the 10% benchmark to be eligible for the preference.  Although it would provide new NCE service to some 28,453 underserved persons, that figure was only 9.46% of the

17

total service area population.  HFC's undeserved population figure was 4,886,

constituting 5.53% of its total service area population.  Despite MVHF's

overwhelmingly superior numbers, this aspect of the comparative selection

process was not invoked because neither applicant met the 10% threshold.  HFC

was chosen as the Tentative Selectee for the new permit on other factors.

Section 307(b) of the Communications Act requires the FCC to distribute

broadcast licenses in a fair, efficient and equitable manner across the nation.   The

FCC states that the new Fair Distribution of Service rule was adopted as an

enhancement in the implementation of § 307(b).  However, all previous regimes

for implementing the § 307(b) directive have used formulas based on the simple

counting of population to receive a new signal without regard for making that

figure relate as the fraction of any other number.  All other factors being equal, the

proposal with highest population coverage would prevail.  However in this case,

MVHF did not prevail even though it would serve a substantially higher

population.  The percentage formula twists the process and thwarts the purposes of

§ 307(b).  The rule is inconsistent with the mandate of § 307(b) and should be

vacated.

In adopting this formula, the FCC was arbitrary and capricious.  The agency

appears to have gotten the seed for the notion from one party's reply comments

and then morphed that concept into the convoluted two-part formula.  The

18

Commission has never provided a solid reasoned explanation for why it suddenly veered away from eight decades of precedent to adopt a new regime that produces radically different and unsatisfactory results.

Finally, the Commission acted arbitrarily, capriciously and without reasoned explanation in denying MVHF's request for a waiver of the 10% threshold so that it could obtain the decisive preference and provide new radio service to the large numbers of underserved residents in its service area. This would have been an ideal scenario in which to exercise a waiver that could overcome the obstacle of a rule that was impeding the very purpose it was supposed to promote. The Commission failed to give this waiver request serious consideration.

In summary, FCC Rule 73.7002 should be vacated because (1) it was adopted without the proper procedures of the Administrative Procedure Act; (2) the rule produces nefarious results that are contrary to the statutory mandates of the Communications Act; (3) the Commission acted arbitrarily and capriciously in adopting it. As an alternative remedy, MVHF seeks a remand to the Commission so that the agency can waive the 10% benchmark, award it the decisive preference and grant its application.

## STANDARD OF REVIEW

The point system rules developed by the FCC to govern application and selection procedures on reserved NCE channels must be evaluated under the two-step test set forth in *Chevron U.S.A.*, *Inc. v. Natural Res. Def. Counsel*, *Inc.*, 467 U.S. 837 (1984). The Court must first ask "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. In determining Congressional intent, the Court must apply all traditional tools of statutory construction, *see id.* at 843, n. 9, and the Court "owes no deference to the agency's views." *Martini v. Fed. Nat'l Mortgage Ass'n.*, 178 F.3d 1336, 1342 (D.C. Cir. 1999), *cert. dismissed*, 120 S. Ct. 1155 (2000). If Congress has spoken directly to the issue, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. Seeming ambiguity of a statute does not necessarily change this standard, for "[a]mbiguity is a creature . . . of statutory context," *Brown v. Jordan*, 513 U.S. 115, 118 (1994) and, often, the "meaning of statutory language . . . depends on context." *King v. St. Vincent's Hospital*, 502 U.S. 215, 221 (1991). Only if the statute is indeed ambiguous or silent with respect to the question at issue is the agency's interpretation entitled to deference and only then should the Court proceed to the second step and determine "whether the agency's answer is based on a permissible construction of

20

the statute." *Chevron*, 467 U.S. at 843; *U.S. Telecom Ass'n v. FCC*, 227 F.3d 450,

458 (D.C. Cir. 2000).

An agency order must also be set aside if it is arbitrary, capricious, an abuse

of discretion, or not in accordance with law.  *See* 5 U.S.C. § 706(2).  While "[t]he

scope of review under the 'arbitrary and capricious' standard is narrow and a court

should not substitute its judgment for that of the agency," a court must,

nevertheless examine whether the rulemaking comports with the statutory

standard.  An "agency must examine the relevant data and articulate a satisfactory

explanation for its action including 'a rational connection between the facts found

and the choice made.' "  *Motor Vehicle Manufacturers Ass'n of the U.S.*, *Inc.*, *et*

*al. v. State Farm Mutual Automobile Insurance Co.*, *et al.*, 463 U.S. 29, 43 (1983).

In reviewing the agency's explanation, the court must "consider whether the

decision was based on a consideration of the relevant factors and whether there

has been a clear error in judgment."  *Bowman Transportation*, *Inc. v. Arkansas-*

*Best Freight System*, *Inc.*, 419 U.S. 281, 285 (1974).  Agency rules "would be

considered arbitrary and capricious if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to

the evidence before the agency, or is so implausible that it could not be ascribed to

a difference in view or the product of agency expertise."  *SEC v. Chenery Corp.*,

21

332 U.S. 194, 196 (1947).  The reviewing court "may not supply a reasoned basis

for the agency's action that the agency itself has not given."  *Id.*

## ARGUMENT

I.     **A Threshold Coverage Formula Based on a Percentage of an
       Applicant's Service Area Population Violates § 307(b) of the
       Communications Act.**

A.     **The Percentage Formula is not Efficient.**

The Communications Act commands the FCC to "to provide a fair, efficient
and equitable distribution of radio service" "among the several States and
communities" of the nation.  47 U.S.C. § 307(b).  To meet the efficiency aspect of
this directive, the Commission has pursued policies through the years to promote
the development of usable radio (and television) service for the maximum number
of people.  The history of comparative selection decision-making by the FCC
during the middle of the twentieth century abounds with examples of the
Commission's efforts to implement such policies.[24]  This Court observed in 1982
that,

> Since 1927, the Commission and its predecessor agency, the Federal
> Radio Commission, have pursued three basic goals in allocating use
> of the radio spectrum: (1) provision of at least one service to all
> persons; (2) provision of service to as many persons from as many

---

[24] *Cf. Alkima Broadcasting Co.*, 44 FCC 2689 (1961) (applicant proposing
to cover the largest population prevailed on an "efficiency issue"); *Camel Co.*, 14
FCC 2d 919 (1968) (providing first service to white area deemed efficient use of
channel).

23

diversified sources as possible; and (3) provision of outlets for local self-expression addressed to each community's needs and interests. [25]

This focus on providing new service to the largest number of people – especially people with minimal existing service – is evident in the Commission's approach to allocating commercial FM channels. The long-standing priorities adopted in a rulemaking proceeding for determining the preferred arrangement of FM allotments incorporate these values:

1.    First full-time aural [reception] service.

2.    Second full-time aural [reception] service.

3.    First local [transmission] service.

4.    Other public interest matters.[26]

Even after the adoption of spectrum auctions as the primary mechanism for resolving conflicts among commercial broadcast applicants, the Commission has strived to incorporate § 307(b) principles in the process of allocating AM radio assignments.[27]   Before the auction takes place, mutually exclusive applicants are screened for factors implicated by § 307(b), including the provision of new aural

---

[25] *Loyola University v. FCC*, 670 F.2d 1222, 1223-1224 (D.C. Cir. 1982).

[26] *Revision of FM Assignment Policies and Procedures*, 90 FCC 2d 88, 91 (1982).

[27] *Competitive Bidding*, 13 FCC Rcd 15920, at ¶120 (1998).

service to the greatest number of people, and to the greatest number of people with fewer existing services available to them.

The Commission recently had occasion to update its FM allotment policies in the *Rural Radio* rulemaking proceeding.[28]  The agency determined that its efficiency policies "require some adjustments," and moved away from simply trying to amass the most "ears per kilowatt."[29]  Nonetheless, the emphasis remained on efficient service to members of the public with little existing radio service.  That emphasis is exemplified in the adoption of a prohibition on creating new "white" or "gray" area – i.e., areas that would be within the service contour of no or only one other station.  To preclude the creation of new pockets of underserved populations, allotments now cannot be relocated if to do so would create any "white" or "gray" areas.[30]  Complying with this policy, the Media Bureau recently denied an application to relocate an FM allotment in a move that would have created a new gray area with a population of only 87 people.[31]  That is

---

[28] *Policies to Promote Rural Radio Service and to Streamline Allotment and Assignment Procedures*, Second Report and Order, First Order on Reconsideration, and Second Further Notice of Proposed Rulemaking, 26 FCC Rcd 2556 (2011) (subsequent history omitted).

[29] *Id.*, at 2565.

[30] *Id.*, at 2577.

[31] *See*, *New FM*, *Avondale*, *Colorado*, 28 FCC Rcd 5667 (MB 2013).

25

to say, the proposal would have left a mere 87 people with one radio service rather than two.  The Commission's current § 307(b) policies continue to favor establishing or maintaining service for the underserved – even in cases where very few people are affected.

Analogous policies were developed for cases involving mutually exclusive NCE FM applications.  In the NCE FM comparative hearing process that was used prior to adoption of the *NCE Order*, a comparative coverage issue was usually designated to determine which of the proposed coverage areas had the greatest need for new NCE service.  Evidence would be adduced to show how many people would receive a first, second, third, etc., NCE signal in each proposed service area.[32]

The point of the foregoing historical recitation is to demonstrate that the Commission's efficiency policies have always charted their legitimacy and success in terms of the raw objective number of people being served – *not* as a percentage of the population of a service area or as a fraction of any other quantifiable value. The Commission departed from this long-standing practice by inserting a

---

[32] *See*, *New York University*, 10 RR 2d 215 (1967); *Carnegie-Mellon Student Government Corporation*, Hearing Designation Order, 7 FCC Rcd 3914 3915 (MB 1992).

26

percentage value into the formula for calculating § 307(b) preferences in the new NCE comparative selection rules.

The FCC *said* it intended to follow its traditional simple numerically based principles in adopting the new selection procedures.  It indicated that it would use the "same general process" as was adopted for § 307(b) analysis of AM applications in the auction rulemaking in *Comparative Bidding*, *supra.*  In the *NCE Order*, the agency stated that:

> [A] proposal to provide the first NCE service received by a comparatively large population will be preferred over another providing the first NCE service received by a significantly smaller population, or the second NCE service to any sized population. Similarly, a proposal that does not provide any significant first NCE service but which provides a second NCE service to a comparatively large population will be preferred over another such proposal providing second NCE service to a significantly smaller population.[33]

However, in the very next paragraph, the Commission flipped history on its head, stepped into the percentages game and completely obliterated its stated intention.  In creating a threshold requirement that at least 10% of the population of the proposed service area must be underserved before a § 307(b) finding can be made, the Commission created the possibility for a scenario like the one that occurred in this case: a proposal to bring a second NCE service to 28,453 persons

---

[33] *NCE Order*, at 7397.

was found NOT to be superior to a proposal that would provide a second NCE

service to only 4,886.  MVHF proposed to provide a second NCE service to

23,567 more people that did HFC.  MVHF's second NCE service population is

overwhelmingly 5.8 times a greater than HFC's corresponding figure.   No other

factors were noted or considered in the § 307(b) analysis.

MVHF is unaware of any other case in the nearly 87-year history of FCC

interpretation and implementation of § 307(b) where such a huge disparity existed

within one category of reception service between two applicants with no other

complicating factors and the applicant proposing the lesser service was chosen to

become the permittee of the new station.[34]  This is truly new and different law

from anything that went before.  It is completely contrary to the both the spirit and

the letter of § 307(b).

### B.    The Percentage Formula is not Fair or Equitable.

A formula that includes a percentage of coverage element as a threshold

criterion for a § 307(b) decisional preference is an invitation for manipulation and

---

[34] The Commission denied another applicant's request for a waiver of the 10% benchmark in the *Omnibus Order*, 22 FCC Rcd, at 6113-6114.  That applicant's combined first and second service population was nearly 25,000 and constituted 9.33% of the total service area population.  With the denial of the waiver request, there was no § 307(b) analysis.  However, a § 307(b) anomaly in the ultimate outcome was averted when that applicant was chosen as the Tentative Selectee on the basis of comparative points.

gamesmanship.  As such, it is neither fair nor equitable to the public awaiting new service nor to the fair-playing applicants who find themselves squeezed out by manipulators.  Efficient and effective use of the spectrum is sacrificed.

Under the unique circumstances of this case, MVHF's technical proposal was frozen on the same day that the *NCE Order* containing the new comparative selection rules was released to the public – April 21, 2001.[35]  It was therefore impossible for MVHF to modify its proposal to achieve benefit under the new rules even if it had wanted to do so.  However, if MVHF had prepared its application with full advance knowledge of the rules, hypothetically, MVHF could have reduced its own facilities so as to reduce the overall population in its service area and thereby to *increase* the fraction of its covered population receiving a second NCE service above that 10% threshold.  Reconfiguring its 60 dBu contour so as to withdraw from just 16,143 residents of a well-served area would have transformed MVHF into an instant winner with a § 307(b) preference.  However, MVHF posits that reduction in service is contrary to the public interest.  Why should 16,143 residents be deprived a new aural service just to give an applicant a comparative advantage?

---

[35] Public Notice, 16 FCC Rcd, at 6893.

Responding to MVHF's observation about the prospects for gaming the system in this manner, the Media Bureau blithely denied such potential and remarked that "the Commission's procedures encourage applicants to apply for the facilities that they wish to construct . . ."[36]  This conclusion is completely blind to the entire comparative selection regime which encourages applicants to possess certain qualities in order to have a better chance of being selected as the permittee. In addition to being unrealistic, it is also contrary to the Commission's own often expressed concern about potential abuse of the system in selecting communities of license solely benefits under § 307(b).

> The timeless problem has come of course, in . . . ensuring that broadcast applicants have not simply manipulated our flexible rules and processes to garner a wholly artificial benefit by specifying a small community as their city of license, though nonetheless intending to (a) achieve merely a 'technical' § 307(b) preference in a comparative case, or (b) serve a larger, adjacent community nearby.[37]

In the *NCE Order*, the Commission expressly rejected the concept of awarding a § 307(b) preference to the applicant able to find the largest community without an existing local service and lock it down as a community of license.  The Commission wanted to avoid the opportunities for gamesmanship in such a system

---

[36] *Letter Decision*, at 18935 (JA__).

[37] *Debra Carrigan*, 100 FCC 2d 721, 725 (Rev. Bd. 1985)(subsequent history omitted).

where an applicant might locate in and obtain the § 307(b) benefits of a small

community on the outskirts of a metropolitan area while really being more

interested in the larger market.[38]  The Commission was wise to avoid that thicket.

However, the morass created by the 10% benchmark is probably worse.

Applicants can easily fashion a proposal with a high percentage of underserved

population in a relatively small service area for the benefit of the § 307(b)

preference, and later enlarge the service area after the construction permit is

issued.  The prospect for abuse is real and it robs the comparative selection regime

of merit.

## II.    The Commission's Denial of Fair Distribution of Service Preference On the Basis of Eligibility Benchmarks Should Be Set Aside as Required by Section 706 of the Administrative Procedure Act.

The basic standard for determining whether agency action should be set

aside as arbitrary and capricious under the Administrative Procedure Act

("APA")[39] requires an initial determination of  whether the agency has provided a

"reasoned explanation" for its judgment.  *Massachusetts v. EPA*, 549 U.S. 497,

534 (2007).  The agency must consider relevant statutory factors, assess available

evidence, examine the ramifications of its decision, and "articulate a satisfactory

---

[38] *NCE Order*, at 7396 (JA ___).

[39] 5 U.S.C. § 551 *et seq.*

31

explanation for the action[,] including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").  An agency order that involves a significant change in policy without a reasoned explanation for doing so must be vacated. *Massachusetts v. EPA*, 127 S. Ct. at 1463; *see also State Farm*, 463 U.S. at 50 ("[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action. It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (citing, *inter alia*, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

With respect to the denial of MVHF's application, other standards for overturning agency action under Section 706(b) of the APA are also implicated, including "abuse of discretion," "not in accordance with law, and "without observance of procedure required by law."  5 U.S.C. §§ 706(b)(2)(A), (D).

The FCC has failed to provide a reasoned explanation for changing its NCE Fair Distribution policy.  In Section IV *infra*, MVHF argues that the FCC's adoption of Rule 73.7002 – which imposed eligibility benchmarks on parties seeking a § 307(b) preference –  not only violated the notice and comment requirements of § 553 of the APA, but should be set aside by this Court because it was adopted "without observance of procedure required by law." 5 U.S.C.

32

§ 706(b)(2)(D).  In this Section II, MVHF will argue that the Commission's failure to justify the new rule's significant change in the focus of Fair Distribution of Service analysis,  either during the rulemaking or in denying MVHF the preference to which it would otherwise have been entitled, was also arbitrary and capricious, an abuse of discretion, and not in accordance with law, under APA section 706(b)(2)(A).

In the recent *Verizon* decision involving the so-called "Net Neutrality" rules, this Court pointed out the similarity in analysis for challenges to rules based on either section 553 and section 706 of the APA:

> Given that these two arguments [i.e., arbitrary and capricious challenges to rules that are also alleged to be unsupported by evidence] involve similar considerations.  We address them together. In so doing, we must uphold the Commission's factual determinations if on the record as a whole, there is such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion. . . .  We evaluate the Commission's reasoning to ensure that it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (quoting *Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43 (1983)) (some internal citations and quotation marks omitted).[40]

The Commission's decision to require NCE applicants that sought a

---

[40] *Verizon v. FCC*, No. 11-1355, slip op. (D.C. Cir. Jan. 14, 2014).

§ 307(b) fair distribution preference to first satisfy two never-before-applied cumulative eligibility benchmarks (one numeric and one percentage-based) lacked any support in the rulemaking record. Far from a "reasoned explanation," neither of the rulemaking notices in the proceeding contained the slightest indication that the Commission might propose a formula that combined a percentage of coverage figure with a minimum required base number of residents.

The rulemaking record reflects not only Commission silence on this significant policy change until the *NCE Order* in which the new rule is both proposed and adopted, but it was able to cite only one commenting party, Mohave Community College, that had even suggested a benchmark eligibility test.[41] The two prior rulemaking notices contain no indication whatsoever, in the form or either comment or Commission inquiry, that an entirely new element would be added to NCE fair distribution analysis. Furthermore, Mohave's proposed test involved a much lower percentage – 5% – of the service area population to be underserved and was presented with a 2000-person minimum proposal as an alternative, not a cumulative, eligibility criteria.[42] The Commission provided no reasoned basis in the *NCE Order*, either for adopting a cumulative criteria bundle,

---

[41] *NCE Order*, at 7397 (JA___).

[42] Reply Comments of Mohave Community College in FCC MM Docket 95-31, filed March 15, 1999, at 11 (JA ___).

34

or for doubling Mohave's proposed percentage.  Rather, it simply adopted

Mohave's 2,000-minimum population figure, doubled Mohave's suggested

percentage, added both to new Rule 73.7002, and cut off any further comment.

Imposition of even one benchmark eligibility standard on an applicant

claiming a § 307(b) preference had no precedent.  For many decades, the FCC has

applied a fair distribution analysis without hard and fast threshold benchmarks.

This allows for the possibility of § 307(b) benefits for any size of community or

service area with a need.  The benchmarks imposed in Rule 73.7002(b) constitute

a distinct departure from many years of FCC policy.[43]

When an administrative agency abruptly departs from a long-standing

policy, reviewing courts have set aside rules and  remanded cases back to the

agency in question. In *Greater Boston Television Corp.*, *v. FCC*, 444 F.2d 841,

---

[43] Subsequent to the adoption of Rule 73.7002, the Commission adopted a
threshold benchmark of a completely different sort for § 307(b) analysis of a
different kind of application.  In the *Rural Radio* First Report and Order, a
threshold benchmark was established for qualified Tribal applicants for new
commercial radio stations.  At least 50% of the area within the proposed principal
community service contour must be Tribal land for the applicant to qualify for a
§ 307(b) preference. *Policies to Promote Rural Radio Service and to Streamline
Allotment and Assignment Procedures*, First Report and Order, 25 FCC Rcd 1583,
1597 (2010).  This policy was part of an effort to obtain more radio service for
Native Americans, and even encouraged applicants to disregard potential service
to other members of the public who might be in the service area.  Furthermore, the
threshold metric is geographic rather than population based.  This policy addresses
a very specialized situation and does not present a useful comparison to Rule
73.7002.

852 (D.C. Cir. 1970), this Court ruled that "An agency's view of what is in the public interest may change, either with or without a change in circumstances.  But an agency changing its course must supply a reasoned analysis."  *See also Michigan Public Power Agency v. FERC*, 405 F.3d 8 (D.C. Cir. 2005) ("[B]ecause the Commission failed to provide an adequate explanation for its apparent departure from past practice, we . . .  remand the cases . . . for further explanation.").  Such changes in policy are permitted "only if the agency provides a 'reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.' "  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 41-42.  [The agency]"must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choices made."  *Greater Boston*, 444 F2d at 852.

The imposition of eligibility benchmarks in rule 73.7002 is not a minor procedural step; nor can the decades-long statutory fair distribution policy be "casually ignored."  Rather, these benchmarks carry decisional and preclusive significance, creating a genuine risk that an application that, in all other respects, would have advanced the fair distribution policies of § 307(b), would nevertheless be dismissed as a result of an infinitesimal shortfall from the arbitrary cutoff.

This is precisely what occurred in the present case.  Commission staff, after a mechanistic application of the percentage benchmark to MVHF's application,

not only dismissed it, but failed to articulate a reasoned basis for doing so.  Neither the Media Bureau, which disregarded the policy implications of its robotic application of the rule, nor the Commission, which affirmed the staff decision without discussion, articulated a "rational connection" for applying the preclusive effect of the percentage benchmark to an application that fell short of the arbitrary 10% measure by only one half of one percent.  Had MVHF's application been granted, it would have provided a second service to approximately six times as many persons as HFC.  However, the fact that MVHF would serve the underlying fair distribution policy better than HFC, with new NCE service to a larger population that needed such service, was simply ignored by the Media Bureau, and, upon review, by the Commission.  The risk that a percentage formula could undermine application of the underlying fair distribution policy was inherent in the changes represented by Rule 73.7002, but the rule was adopted by the FCC without a reasoned analysis explaining why it was changing the focus of fair distribution policy.

The arbitrariness the 10% benchmark in the portion of Rule 73.7002 that pertains to MVHF is exacerbated by the fact that the Commission subsequently amended subsection (b) to add provisions concerning a § 307(b) preference for Tribal applicants.  In cases involving multiple Tribal applicants, the nod will go the applicant providing service to the largest number of people on Tribal lands

37

without regard to a percentage threshold figure or any other factor. The rule states:

> If two or more full-service FM applicants identify themselves as Tribal Applicants and meet the above criteria, the applicant providing the most people with reserved channel NCE service to Tribal Lands will be awarded a construction permit, regardless of the magnitude of the superior service or the populations of the communities of license proposed, if different.[44]

The Commission has completely failed to explain why the 10% threshold benchmark should be applied to non-Tribal parties, but not to Tribal applicants.

In adopting the rule and in applying it to MVHF's application, the Commission acted in an arbitrary and capricious matter by failing to provide a reasonable explanation for why it was ignoring statutory fair distribution policy. Implementation Rule of 73.7002 as presently drafted was an arbitrary and capricious action which should be set aside.

## III.   Refusal to Waive the Benchmark Eligibility Provision of Rule 73.7002(b) Was Arbitrary and Capricious and an Abuse of Discretion.

MVHF asked the Media Bureau to waive strict application of the percentage eligibility benchmark under Rule 73.7002(b),[45] pointing out that its under-served population percentage, at 9.46%, was within 0.5% of the rule's 10% benchmark –

---

[44] 47 C.F.R. § 73.7002(b).

[45] Mary V. Harris Foundation Petition to Deny Application of Holy Family Communications, Inc, at 5-6 (JA ___).

38

close enough to come within the margin of error.  Furthermore, it argued, granting

the waiver would promote the fair distribution preference policy, since MVHF's

application would bring  second NCE service to six times as many persons as

would HFC's application.  The staff, however, denied the waiver request without

providing a reasonable basis for doing so.[46]  The denial was premised on a strict

application of the rule's threshold percentage, a basis that ignores the fundamental

nature of waiver – a request that the strict rule requirement not be applied. The

Media Bureau decision, in fact, disregards Applicant's 9.46% showing and its

claim that the waiver will serve the underlying policy.  The Media Bureau sought

to justify rejecting the waiver request by referring to another MX group in the

*Omnibus Order*, in which the Bureau denied a request for a waiver of the 10%

benchmark from a party whose underserved population amounted to 9.33% of its

service area population.  The Bureau did not explain its rationale for denying that

party's waiver or offer any explanation as to connections or similarities between

the two applications.  Denial of MVHF's waiver request was arbitrary and

capricious because it was not based upon a rational waiver policy as required by

this Court's decision in *WAIT Radio v. FCC*, 418 F.2d 1153 (D.C. Cir. 1969)

("*WAIT Radio*").

---

[46] *Letter Decision*, at 18934-18935 (JA___).

Under Rule 1.3 of its Rules, 47 C.F.R. § 1.3, the Commission has authority to waive its rules if "good cause" to do so is shown. The FCC has discretion to waive any of its rules when particular facts related to the waiver would make strict compliance inconsistent with the policy underlying the rule to be waived. *WAIT Radio*, 418 F.2d at 1159. Generally, the Commission's rules may be waived for good cause, and the FCC may exercise its discretion to waive a rule where the particular facts make strict compliance inconsistent with the public interest. In addition, the Commission may take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis. Waiver of the Commission's rules is appropriate when special circumstances warrant a deviation from the general rule, and such a deviation will serve the public interest. *WAIT Radio, Id.*[47] Under these standards, the minor wavier of the benchmark percentage that MVHF requested  should have been granted. It would have brought new NCE service to a relatively large underserved population (compared to the much smaller number proposed by HFC). The result would have been perfectly consistent with the policies underlying the fair distribution policy and Rule 73.7002. Waiver, rather than strict compliance with the 10% benchmark,

---

[47] *Also see*, *Network IP*, *LLC v. FCC*, 548 F.3d 116, 125-28 (D.C. Cir. 2008); *Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990).

would better serve the public interest.  Bringing new NCE service to both the

underserved population and the population of MVHF's entire service area (which

was more than three times the size of HFC's entire covered population) would

further the policies underlying Section 307(b), the Public Broadcasting Act, and

Rule 73.7002 itself.  It was arbitrary and capricious, and an abuse of discretion, for

the Commission staff to deny the requested waiver so summarily and abruptly, and

for the Commission, on review, to affirm that denial. The abuse of discretion and

the arbitrary and capricious nature of the denial are compounded by the failure of

staff and the FCC itself to provide a reasoned explanation for denying the waiver.

## IV.    The FCC's Adoption of a Two-Tier Eligibility Benchmark as a Prior Condition to Evaluating Applicants under the Fair Distribution of Service Criterion Violated the APA.

The Fair Distribution of Service policies underlying § 307(b) of the

Communications Act have historically been expressed and implemented as a

preliminary or "threshold" examination of relative coverage to determine which,

among various communities proposed to be served by contending radio or

television applicants, had the greater need for such service.  As the Commission

itself pointed out in the *NCE Order*, treating fair distribution as a threshold issue is

the approach "most consistent with our existing § 307(b) approach, which has

been upheld in court and recently followed in establishing auction procedures for

41

commercial AM stations. . . .  [I]n those cases where there are substantial § 307(b)

differences, such matters will be addressed first." *NCE Order*, 15 FCC Rcd at

7397 (JA____).[48]

The Commission explained that, in implementing its new Fair Distribution

of Service rule for NCE applicants, it would first evaluate proposals to determine

which, if any, provided first NCE service to a "comparatively large population

[which] will be preferred over another providing first service received by a

significantly smaller population."  Likewise, if neither proposal would provide a

first NCE service, the same evaluation will be done with respect to second NCE

service, where again, service "received by a comparatively large population will

be preferred over another such proposal providing second NCE service to a

significantly smaller population."  *NCE Order*, 15 FCC Rcd at 7397 (JA___).

This approach was not inconsistent with what the Commission had

proposed in the proceeding's *Further Notice of Proposed Rulemaking* where the

agency had "proposed to award points to applicants who:  (1) would offer a first or

second NCE service to the community; (2) who had no other nearby stations; and

(3) would serve at least ten percent more area and population than a competing

---

[48] *Citing*, *FCC v. Allentown Broadcasting Corp.*, 349 U.S. 358 (1955);
*Pasadena Broadcasting Co. v. FCC*, 555 F.2d 1046 (D.C. Cir. 1977); *Competitive
Bidding*, 13 FCC Rcd 15920, 16010 (1998).

proposal."[49]  As adopted, however, the new rule 73.2007(b) added a new and

untested element – a two-tier "eligibility benchmark" which required that new

service would be provided to a minimum of 2000 persons who did not already

receive at least two NCE radio signals, representing at least 10% of the total

service area population.  Such a two-part threshold test for was foreign to § 307(b)

analysis.  The two-tier eligibility test is an aberration, both procedurally in terms

of appropriate notice and comment rulemaking principles, and substantively, in

that a 10%-minimum eligibility test is contrary to the letter and spirit of fair

distribution of service policies.  The Commission's decision to close the

proceeding, cutting off comment on the actual text of the newly-proposed and

adopted rules, prevented the statutorily required public appraisal of the

percentage-based eligibility test.  Blocking further comment on a newly-proposed

rule was arbitrary and capricious, an abuse of the Commission's discretion, and

contrary to the basic requirements of notice-and-comment rulemaking under § 553

of the Administrative Procedure Act, 5 U.S.C. § 553.  As a result, the record in the

NCE Comparative Standards proceeding is sadly lacking in any supportive

rationale for  the methodology that was adopted for application of the fair

---

[49] *Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Further Notice of Proposed Rulemaking, 13 FCC Rcd 21167 (1998) ("*Further Notice*").

43

distribution standard. As this Court reminded the Commission in *New South Broadcasting Corporation v. FCC*, 879 F. 2d 867, 872 (D.C. Cir. 1989), "[t]he FCC, of course, is free to alter its [§ 307(b)] policies in the future, so long as it provides an adequate explanation of its actions." It has failed to do so here.

**A.      The NCE Comparative Standards Rulemaking Record Demonstrates the Lack of Opportunity for Interested Parties to File Meaningful Comments with Respect to the Commission's Ultimate Change of Policy**.

In general, § 553 of the APA requires government agencies to provide advance notice and an opportunity for the public to comment on proposed rules. The Commission has been found previously to have provided inadequate notice and comment opportunity in other cases. In *Prometheus Radio Project v. FCC,* 652 F.3d 431 (3d Cir. 2011*)* ("*Prometheus II*"), for example, the Third Circuit held that the Commission had not provided adequate notice of the most recent version of a proposed media cross-ownership rule. The Court based this decision on a comprehensive review of the rulemaking record, particularly what information the FCC provided to the public and the opportunity provided for the public to respond. The court explained that an assessment of "whether the public was fairly apprised of a new rule . . . requires one to ask 'whether the purposes of notice and comment

44

have been adequately served.'"[50]  According to this decision, the purposes of notice and comment rulemaking are: (1) to ensure that agency regulations are tested via exposure to diverse public comment; (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union*, *United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).  In addition, "a chance to comment . . . [enables] the agency [to] maintain[] a flexible and open-minded attitude towards its own rules.' " *Prometheus II*, 652 F.3d at 449, citing *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1325 (D.C. Cir. 1988) (internal citation omitted).  Furthermore, "the adequacy of the notice must be tested by determining whether it would fairly apprise interested persons of the 'subjects and issues' before the agency."  *Prometheus II*, 652 F.3d at 449, citing *Prometheus Project v. FCC*, 373 F.3d 372, 411 (3d Cir. 2004) (citing *Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284, 293 (3d Cir. 1977).  The *Prometheus II* Court also cited this Circuit's *HBO* decision on notice-and-comment rulemaking standards:

---

[50] *Prometheus II*, 652 F.3d at 449, citing *American Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994) (internal quotation and citation omitted); *see also Natural Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002).

45

to achieve those purposes, there must be an exchange of views, information, and criticism between interested persons and the agency. . . . Consequently, the notice required by the APA . . . must disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based. . . . [A]n agency proposing informal rulemaking has an obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible."[51]

One test for assessing an agency's compliance with APA standards is the "logical outgrowth" doctrine.  "Stated inversely," the *Prometheus II* decision explains, "that doctrine asks if the 'substance of an agency's final rule strays too far from the description contained in the initial notice . . . . *Council Tree Communications*, *Inc. v. FCC*, 619 F.3d 235, 249 (3d Cir. 2010).  If so, the final rule is not a 'logical outgrowth' of the rule proposed in the notice, and 'the agency may have deprived interested persons of their statutory right to an opportunity to participate in the rulemaking.'"  MVHF submits that FCC Rule 73.7002(b) does not satisfy the "logical outgrowth" doctrine, as consideration of the procedural and substantive irregularities reveals.  MVHF recognizes that, procedurally, the case before this Court is an appeal seeking reversal of an FCC order that dismissed its application for a new broadcast station on the basis of a fair distribution of service analysis pursuant to Rule 73.7002(b), rather than a straightforward Petition for

---

[51] *Prometheus II*, 652 F.3d at 453, citing *Home Box Office*, *Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977) (internal citations and footnotes omitted).

Review of that rule as adopted.  However, the procedural flaws and irregularities in the rulemaking proceeding – specifically, the lack of prior notice of the rule itself and the abrupt termination of the proceeding, foreclosing comments on the actual rule – inevitably raise questions regarding whether the Rule applied to MVHF's application was the "logical outgrowth" of the original proposal, and whether the lack of adequate notice is responsible for the problems with the rule.

The primary question is whether the newly-hatched minimum eligibility gloss imposed on fair distribution standards in the April 2000 *NCE Order* could possibly be deemed a "logical outgrowth" of the Commission's entirely theoretical proposals in the 1998 *Further Notice*.  Nothing in either the initial notice, the 1995 *Notice of Proposed Rulemaking ("NPRM")*,[52] or the 1998 *Further Notice* could have alerted any interested or affected party that the long-standing fair distribution standards would end up five years later with a minimum eligibility percentage formula.  These irregularities relating to this Rule include (1) the two-step minimum-threshold formula differs markedly from the policies upon which it is based, the original proposals in the rulemaking notices, and the comments cited by the Commission in the *NCE Order*; (2) the new rule ignores and, in fact, produces

---

[52] *Reexamination of Comparative Standards for Noncommercial Educational Applications*, Notice of Proposed Rulemaking, 10 FCC Rcd 2877 (1995).

47

results that are counter to long-standing Congressional policy underlying not only fair distribution of service preference of § 307(b) but also NCE proliferation policies of the Public Broadcasting Act; (3) inconsistent and confusing summaries, characterizations, and explanations of the new rule and its percentage test have emphasized the inherent ambiguities in how the rule is discussed and applied. Close consideration of the procedural history and substantive development of Rule 73.7002 reveals that the final rule is not the logical outgrowth of the Commission's initial proposal.

**B.    The Commission Violated the Notice and Comment Requirements of Section 553(b) of the Administrative Procedure Act in Promulgating the Final Version of Rule 73.7002.**

Commission Rule 73.7002 was adopted on April 4, 2000, by the Commission as part of the newly-developed NCE Point System and, along with the other new NCE Point System rules, was first made public in the *NCE Order*, which was released to the public on April 21, 2000.  In the *NCE Order*, the Commission revealed the text of this rule for the first time in Appendix D; discussed, also for the first time, the only prior comments (from 1998 and 1999) upon which the new Rule 73.7002 purportedly was based, *NCE Order*, 15 FCC Rcd at 7395-7400; summarized the rule –  differently from the rule's actual text – in Appendix A; and terminated the rulemaking proceeding.  The public's first

48

opportunity to review the new rule occurred several weeks later, after the FCC had already adopted it, published it with an inconsistent summary, and closed down the proceeding, precluding further comment.

To understand how little actual consideration was given by the Commission or commenting parties to the eligibility benchmark aspects of Rule 73.7002, a review of the rulemaking history is in order.  In the 1995 *NPRM* in Docket 95-31, the Commission asked for proposals for an NCE comparative selection system, based either on points or on other factors.  In this *NPRM*, the FCC noted a National Public Radio comment that applicants should "demonstrate a workable ability to bring service to unserved or under-served areas."[53]  The National Federal of Community Broadcasters (NFCB) suggested that the point system should include three points for "spectrum efficiency," which included an application coverage comparison. This NPRM requested comment on several issues, none of which related to fair distribution, coverage, or spectrum efficiency.  Basically, the public was invited to comment on NPR's and NFCB's proposals.

In 1998, the Commission issued the *Further Notice* in which it summarized additional comments of several parties and requested more comment, basically

---

[53] *Reexamination of the Comparative Standards for New Noncommercial Educational Applicants*, Notice of Proposed Rulemaking, 10 FCC Rcd 2877, 2878 (1995).

49

again on the NPR and NFCB proposals. *Further Notice*, 13 FCC Rcd at Appendix A.

When the Commission released the *NCE Order* two years later, without the interim step of unveiling proposed rules, it presented the public with a set of final, already adopted NCE Point System rules. This *NCE Order* was the first time applicants and other interested parties had an opportunity to review the Commission's adoption of numeric and percentage "threshold" eligibility criterion. This Commission revealed in the *NCE Order* that the seed for the new fair distribution formula had been planted by Mohave Community College in its Reply Comments. NPR had filed comments on the issue of "spectrum efficiency" and addressed fair distribution principles. NPR proposed that points should be awarded for (1) applications that demonstrate a 10% or more difference in population and coverage area, and (2) applications that provide NCE service to "presently under-served" populations. Mohave commented on NPR's proposal, stressing what it saw as a need for a 10% differential between the greater and lesser applicants. Significantly, Mohave was the only party that proposed a benchmark formula for determining what would be deemed a "significant population, suggesting that it could be EITHER based on a minimum number of persons served (2000) OR expressed as a percentage of population in the coverage area (5%). *NCE Order*, 15 FCC Rcd at 7397.

In place of Mohave's proposal for a single eligibility benchmark either numeric or percentage-based, the FCC, without explanation, doubled the percentage to 10% and made the number/percentage standards cumulative rather than alternative. The other proposed percentage standard, a 10% differential between applications, is not found in Rule 73.7002, replaced by an arbitrarily-chosen number of 5000 persons, a number that had not been suggested by any commenting party or proposed in either of the rulemaking notices. *NCE Order*, 15 FCC Rcd at 7398.

As discussed above, when "an agency's final rule strays too far from the description contained in the initial notice, . . . the final rule is not a 'logical outgrowth' of the rule proposed in the notice. *Council Tree Communications*, *Inc. v. FCC*, 619 F.3d at 249. The *Council Tree case* concerned challenges to revision of several FCC rules. The Third Circuit found that where the Further Notice of Proposed Rulemaking provided "no indication" of the FCC's ultimate preclusive intention, which went much further than the limited issue on which comment was sought, the rules should be deemed to have been promulgated without the required notice and comment. Even if the more stringent restriction had been the FCC's intent, the Court reasoned, "an unexpressed intention cannot convert a final rule into a 'logical outgrowth' that the public should have anticipated." *Council Tree*, 619 F.2d at 255, citing *Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991).

51

"The essential inquiry," as the First Circuit Court of Appeals explained in

*Basf Wyandotte Corp.*, *v. M. Costle E.I. duPont Nemours & Co*, 598 F.2d 637, (1st

Cir. 1979), "is whether the commenters had a fair opportunity to present their

views on the contents of the final plan."  If a new opportunity for comment had

been provide, would commenting parties have then had their first opportunity, at

that point, "to offer new and different criticisms which the Agency might find

convincing."  If the answer to this inquiry is affirmative, the Court stated, notice

and comment must be found lacking, and remand is the appropriate remedy.

> Thus, where the final rules 'are the result of a complex mix of
> controversial and uncommented upon data and calculations,' remand
> may be in order. . . . Similarly, where the Agency adds a new . . .
> parameter without giving notice of intention to do so or receiving
> comments, there must be a remand to allow public comment.
> *American Frozen Food*, *Institute v. Train*, 539 F.2d 107, 134 (1976).

Having reviewed the history of this proceeding, it is clear that the initial

notice contained no indication that § 307(b) policies would be adapted for

consideration of NCE first and second service, or that those policies would be

undermined by a set of benchmarks that turn caselaw on its head.  The rights of

parties affected bythis rulemaking were severely compromised in that no

opportunity to comment on the final rule was ever permitted.  The rule as finally

adopted is not a "logical outgrowth" of anything previously deliberated in this

proceeding and could have been logically anticipated.   The rule is the product of

52

an arbitrary and capricious rulemaking proceeding, an abuse of the Commission's

discretion and was most certainly contrary to the mandates of the APA.

## CONCLUSION

In *American Family Association et al. v. FCC*,[54] this Court rejected challenges filed by American Family Association and the State of Oregon to many of the NCE comparative selection rules. Rule 73.7002 was not reviewed in that decision.[55] The Court at that time upheld the point system rules as rational and constitutional. However, the Court also said that its decision did not foreclose future challenges to the NCE comparative selection rules, and indeed invited the Commission to reexamine these rules periodically to ensure that they are producing the intended results:

> The Commission may well have a future obligation to reevaluate the point system if the empirical predictions and premises it used to justify the point system turn out to be erroneous. As we have previously noted, the FCC's necessarily wide latitude to make policy based on predictive judgments deriving from its general expertise implies a correlative duty to evaluate its policies over time to ascertain whether they work – that is, whether they actually produce the benefits the Commission originally predicted they would. *Bechtel v. FCC*, 10 F.3d 875, 880 (D.C. Cir. 1993) (internal quotation marks and citation omitted).[56]

---

[54] 365 F.3d 1156 (D.C. Cir. 2004).

[55] MVHF is not aware that the rationality, statutory legitimacy or constitutionality of Rule 73.7002 has previously been raised before this or any other Court by any other party.

[56] *American Family Association v. FCC, op cit.*, at 1166.

54

It is time to conduct such a reevaluation.  The Commission's predictive judgments with respect to use of the Fair Distribution of Service criterion in Rule 73.7002 has been shown to produce irrational results that thwart the purposes of § 307(b) of the Communications Act and deprive the public of the most efficient means for providing NCE aural service to underserved populations.  Pegging the threshold benchmark for coverage of underserved area to 10% of the total primary service area population is arbitrary and capricious.  Furthermore, the rule was adopted in the absence of the statutorily required opportunity for public notice and comment.  It is high time to revisit Rule 73.7002.

For the foregoing reasons, the provisions of the *NCE Order* pertaining to 10% threshold in the Fair Distribution of Service criterion should be vacated.  In the alternative, having shown that its proposal would further the objectives of § 307(b) despite Rule 73.7002, MVHF requests that the Court remand this case to the FCC with instructions to waive Rule 73.7002 in this instance and to grant MVHF's application.

March 31, 2014                          Respectfully submitted,

                                        /s/ Donald E. Martin
                                        Donald E. Martin

                                        DONALD E. MARTIN, P.C.
                                        P.O. Box 8433
                                        Falls Church, Virginia 22041
                                        Telephone (703) 642-2344

                                        Counsel for
                                        Mary V. Harris Foundation

Ernest T. Sanchez
Susan M. Jenkins
The Sanchez Law Firm, P.C.
1155 F Street, N.W., Suite 1050
Washington, D.C. 20004
Telephone (202) 237-2814

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*11,806*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Corel Word Perfect 14*] in [*14pt Times New Roman*]; *or*

    [     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>March 31, 2014</u>          <u>/s/ Donald E. Martin</u>
                                      *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 31st day of March, 2014, I caused this Page

Proof Brief of Appellant to be filed electronically with the Clerk of the Court using

the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

Matthew J. Dunne
Richard K. Welch
Jacob M. Lewis
FEDERAL COMMUNICATIONS COMMISSION
  OFFICE OF THE GENERAL COUNSEL
445 12th Street, SW
Washington, DC  20554
(202) 418-1720

*Counsel for Appellee*

Denise B. Moline
LAW OFFICE OF DENISE B. MOLINE
358 Pines Boulevard
Lake Villa, Illinois  60046
(847) 245-7414

*Counsel for Intervenor for Respondent*

I further certify that on this 31st day of March, 2014, I caused the required

copies of the Page Proof Brief of Appellant to be hand filed with the Clerk of the

Court.

/s/ Donald E. Martin
*Counsel for Appellant*