BRIEF FOR APPELLEE

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

NO. 13-1304

———————

MARY V. HARRIS FOUNDATION,

APPELLANT,

V.

FEDERAL COMMUNICATIONS COMMISSION,

APPELLEE.

———————

ON APPEAL FROM AN ORDER OF
THE FEDERAL COMMUNICATIONS COMMISSION

———————

JONATHAN B. SALLET
ACTING GENERAL COUNSEL

DAVID M. GOSSETT
ACTING DEPUTY GENERAL COUNSEL

RICHARD K. WELCH
DEPUTY ASSOCIATE GENERAL COUNSEL

MATTHEW J. DUNNE
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellee the Federal Communications Commission ("FCC") certifies as follows:

**1. Parties.**

All parties, intervenors, and amici appearing before the FCC and in this Court are listed in the Brief for Appellant Mary V. Harris Foundation.

**2. Rulings under review.**

The ruling under review in this case is the FCC's decision in *Holy Family Communications, Inc.*, Memorandum Opinion and Order, 28 FCC Rcd 4854 (2013) (JA___), *recon. denied, Holy Family Communications, Inc.*, Order on Reconsideration, 28 FCC Rcd 15687 (MB 2013) (JA___).

**3. Related cases.**

The FCC is not aware of any related cases.

# TABLE OF CONTENTS

Table of Authorities.........................................................................iii

Glossary ........................................................................................vii

Jurisdiction ......................................................................................1

Questions Presented .........................................................................2

Statutes and Regulations ..................................................................3

Counterstatement..............................................................................4

    A.   Problems with the Previous Regime of Comparative
        Hearings to Issue Noncommercial Educational FM Radio
        Licenses .............................................................................4

    B.   The Present Noncommercial Educational FM Radio
        License Framework ...........................................................6

        1.   Threshold Fair Distribution Preference Inquiry...............7

        2.   Second-Stage Points-Based Comparison .......................10

    C.   Subsequent History of the 2000 NCE Rules ......................12

    D.   Order Under Review ........................................................13

        1.   Initial Applications.........................................................13

        2.   Omnibus Order...............................................................14

        3.   The Harris Foundation's Administrative Appeals ..........17

Summary of Argument.....................................................................20

Standard of Review .........................................................................23

Argument.........................................................................................25

I.    The Fair Distribution Threshold Is Lawful..............................25

    A.   The FCC reasonably interpreted Section 307(b) in
        instituting the fair distribution threshold............................25

B.    The FCC reasonably explained its decision to implement
the fair distribution threshold. ...........................................................32

II.   The Commission Did Not Abuse Its Discretion In Denying
A Waiver Of The 10 Percent Threshold. ...................................................34

III.   Appellant's Notice-And-Comment Challenge Is Untimely
And, In Any Event, Without Merit. ........................................................37

Conclusion ....................................................................................................41

# TABLE OF AUTHORITIES

## CASES

\* *Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1 (D.C. Cir. 2009) ......................................................................... 25, 28, 33

*American Family Ass'n, Inc. v FCC*, 365 F.3d 1156 (D.C. Cir. 2004) ................................................................... 11, 13

*AT&T Corp. v. FCC*, 220 F.3d 607 (D.C. Cir. 2000) ........................................34

*BDPCS, Inc. v. FCC*, 351 F.3d 1177 (D.C.Cir.2003) ............................. 25, 34

*Bechtel v. FCC*, 10 F.3d 875 (D.C. Cir. 1993) ..................................................5

*BellSouth Corp. v. FCC*, 162 F.3d 1215 (D.C. Cir. 1999) ................................................................................34

*Blanca Tel. Co. v. FCC*, 743 F.3d 860 (D.C. Cir. 2014) ............................................................................. 25, 34

*Cellular Telecomm. & Internet Ass'n v FCC*, 330 F.3d 502 (D.C. Cir. 2003) ............................................37

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ............................................24

*Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291 (D.C. Cir. 2003) ................................................................... 24, 32

*Covad Commc'ns Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006) ................................................................................40

*Crawford v. FCC*, 417 F.3d 1289 (D.C. Cir. 2005) ........................................40

*FCC v. Allentown Broadcasting Corp.*, 349 U.S. 358 (1955) ............................................................... 9, 25, 27

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ................................................................................ 24, 32

*Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C. Cir. 1958) ................................................................................37

*Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Reserve Sys.*, 195 F.3d 28 (D.C. Cir. 1999) ........................................37

\* *JEM Broad. Co., Inc. v. FCC*, 22 F.3d 320 (D.C. Cir. 1994) ............................................................... 1, 23, 37, 38

*Nat'l Pub. Radio, Inc. v. FCC*, 254 F.3d 226 (D.C.
    Cir. 2001) ................................................................. 4, 5, 12, 13

*Omnipoint Corp. v. FCC*, 78 F.3d 620 (D.C. Cir.
    1996) ........................................................................... 38, 40

*Pasadena Broad. Co. v. FCC*, 555 F.2d 1046 (D.C.
    Cir. 1977) ..........................................................................28

*Raton Gas Transmission Co. v. FERC*, 852 F.2d
    612 (D.C.Cir.1988) .............................................................38

**STATUTES**

28 U.S.C. § 2344 ....................................................... 1, 37

47 U.S.C. § 303 ...............................................................4

47 U.S.C. § 307 ...............................................................4

\* 47 U.S.C. § 307(b) ............................................... 7, 25, 26

47 U.S.C. § 309 ...............................................................4

47 U.S.C. § 309(j)(2)(c) .................................................6

47 U.S.C. § 397(6) ..........................................................6

47 U.S.C. § 402(b)(1) ......................................................1

5 U.S.C. § 553 .................................................................3

5 U.S.C. § 706(2)(A) .................................................. 3, 24

Balanced Budget Act of 1997, Pub. L. No. 105-33,
    111 Stat. 251 ....................................................................6

**REGULATIONS**

47 C.F.R. § 1.106(b)(3) .................................................20

47 C.F.R. § 1.106(p) ......................................................20

47 C.F.R. § 73.7000-73.7005 .........................................7

47 C.F.R. § 73.7002 ........................................................8

47 C.F.R. § 73.7002(b) ....................................... 2, 31, 33

47 C.F.R. § 73.7003 ......................................................11

47 C.F.R. § 73.7003(b)(4) .............................................31

47 C.F.R. § 73.7004 ......................................................15

47 C.F.R. § 73.7005(b) ...................................................................31

**ADMINISTRATIVE DECISIONS**

*Applications of Real Life Educ. Found. of Baton Rouge, Inc., Jimmy Swaggart Ministries*, 6 FCC Rcd 2577 (Rev. Bd. 1991) ...........................................8

*Competitive Bidding for Commercial Broadcast and ITFS Licensees*, Report and Order, 13 FCC Rcd 15920 (1998) ...........................................................6, 9

*New York University*, 10 Rad. Reg. 2d (P&F) 215 (1967) ........................................................ 7, 32

*Policies to Promote Rural Radio Service and to Streamline Allotment and Assignment Procedures*, First Report and Order, 25 FCC Rcd 1583 (2010) ..............................................................33

*Reexamination of Competitive Standards for Noncommercial Educ. Applicants*, Memorandum Opinion and Second Order on Reconsideration, 17 FCC Rcd 13132 (2002) ...........................................41

\*   *Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Further Notice of Proposed Rulemaking, 13 FCC Rcd 21167 (1998) .................................................. 4, 6, 9, 39

\*   *Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Memorandum Opinion and Order, 16 FCC Rcd 5074 (2001) ...................................... 12, 14, 29, 30, 40

*Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Notice of Proposed Rulemaking, 10 FCC Rcd 2877 (1995) ..............................................................5

\*   *Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Report and Order, 15 FCC Rcd 7386 (2000) .... 6, 7, 8, 9, 10, 11, 14, 26, 27, 29, 32, 33, 35, 36

*Reexamination of the Policy Statement on
   Comparative Broad. Hearings*, Notice of
   Proposed Rulemaking, 7 FCC Rcd 2664 (1992)..........................................5

*\* Cases and other authorities principally relied upon are marked with
asterisks.*

# GLOSSARY

| | |
|---|---|
| Act | The Communications Act of 1934, as amended |
| Bureau | FCC Media Bureau |
| Central Florida | Central Florida Educational Foundation, Inc. |
| *Competitive Bidding Order* | *Competitive Bidding for Commercial Broadcast and ITFS Licensees*, Report and Order, 13 FCC Rcd 15920 (1998) |
| FCC | Federal Communications Commission |
| The Harris Foundation | Mary V. Harris Foundation |
| Holy Family | Holy Family Communications, Inc. |
| NCE (used only in citations and quotations) | Noncommercial Educational (broadcast) |
| *NCE Order* | *Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Report and Order, 15 FCC Rcd 7386 (2000) |
| *NCE NPRM* | *Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Further Notice of Proposed Rulemaking, 13 FCC Rcd 21167 (1998). |
| *NCE Recon Order* | *Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Memorandum Opinion and Order, 16 FCC Rcd 5074 (2001) |
| *Omnibus Order* | *Comparative Consideration of 76 Groups of Mutually Exclusive Applications for Permits to Construct New or Modified Noncommercial Educational FM Stations*, Memorandum Opinion and Order, 22 FCC Rcd 6101 (2007) |

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

——————

NO. 13-1304

——————

MARY V. HARRIS FOUNDATION,

APPELLANT,

V.

FEDERAL COMMUNICATIONS COMMISSION,

APPELLEE.

——————

ON APPEAL FROM AN ORDER OF
THE FEDERAL COMMUNICATIONS COMMISSION

——————

BRIEF FOR APPELLEE

——————

## JURISDICTION

This Court has jurisdiction over many of Appellant's claims under 47
U.S.C. § 402(b)(1).  However, as detailed below, Appellant's challenge that
the agency failed to provide adequate notice and opportunity for comment on
the underlying substantive rule, issued in 2000, is untimely.  28 U.S.C.
§ 2344.  This Court therefore lacks jurisdiction to hear that challenge.  *JEM
Broad. Co., Inc. v. FCC*, 22 F.3d 320, 325 (D.C. Cir. 1994).

# QUESTIONS PRESENTED

Under rules the FCC instituted in 2000, when multiple applicants seek mutually exclusive noncommercial educational FM radio licenses, in specified circumstances the agency awards the license to an applicant that would provide service to a community that currently has no or limited noncommercial educational FM radio.  In particular, at a threshold phase of the process, the agency awards a dispositive preference to an applicant that would provide the first or second noncommercial educational FM radio service to at least 10 percent of the population covered by the proposed station, provided that this 10 percent represents at least 2,000 people.  47 C.F.R. § 73.7002(b).  If no party receives this "fair distribution" preference, the agency selects the applicant that receives the most points based on a number of other objective criteria.

Appellant Mary V. Harris Foundation (the Harris Foundation) and Intervenor Holy Family Communications, Inc. (Holy Family) filed mutually exclusive license applications.  Because the Harris Foundation proposed to provide first or second noncommercial educational FM radio service to only 9.46 percent of its proposed service population, it did not qualify for the dispositive preference.  The agency then awarded the license to Intervenor

Holy Family instead based on the remaining decisional criteria.  The Harris

Foundation's appeal presents the following questions for review:

1.  Whether the 10 percent fair distribution preference represents an

unreasonable interpretation of Section 307(b) of the Communications Act, or

is otherwise arbitrary, capricious, or contrary to law under the Administrative

Procedure Act (APA), 5 U.S.C. § 706(2)(A).

2. Whether the FCC abused its discretion by not waiving its rule and

awarding a dispositive fair distribution preference to the Harris Foundation.

3. Whether the Harris Foundation is time-barred from raising a

procedural challenge to the underlying rule issued in 2000, and, if not,

whether the agency failed to provide adequate notice and opportunity to

comment on the procedure implementing the fair distribution preference, as

required by the APA, 5 U.S.C. § 553.

## STATUTES AND REGULATIONS

The relevant statutes and regulations are appended to this brief.

# COUNTERSTATEMENT

This case concerns the award of a noncommercial educational FM radio license in upstate New York to Intervenor Holy Family Communications, Inc., over the mutually exclusive application by Appellant the Mary V. Harris Foundation.

### A. Problems with the Previous Regime of Comparative Hearings to Issue Noncommercial Educational FM Radio Licenses

The Communications Act of 1934, as amended (Act), directs the FCC to advance the "public interest, convenience, [and] necessity" by granting broadcast licenses. *See* 47 U.S.C. §§ 303, 307, & 309. As part of this duty, the FCC has long reserved portions of the FM radio spectrum for noncommercial educational use because of the "'high quality type of programming…available in such stations—programming of an entirely different character from that available on most commercial stations.'" *See Nat'l Pub. Radio, Inc. v. FCC*, 254 F.3d 226, 227 (D.C. Cir. 2001) (quotation marks and citations omitted). Noncommercial educational licensees include schools, churches, and not-for-profit corporations and foundations. *See Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Further Notice of Proposed Rulemaking, 13 FCC Rcd 21167, 21168, ¶ 2 (1998) (*NCE NPRM*).

4

Until the 1990s, the Act required that when two applicants sought mutually exclusive licenses—i.e., licenses that could not operate simultaneously because of interference—the Commission must hold an evidentiary hearing before an administrative law judge to choose which applicant would receive the license. *See Nat'l Pub. Radio*, 254 F.3d at 227.

By the 1990s, the FCC and courts began to see this system of evidentiary comparative hearings as both inefficient and impermissibly subjective. *See Bechtel v. FCC*, 10 F.3d 875, 885 (D.C. Cir. 1993) (criteria used in hearings were "packed with subjective judgments, some generic, some ad hoc"); *Reexamination of the Policy Statement on Comparative Broad. Hearings*, Notice of Proposed Rulemaking, 7 FCC Rcd 2664, 2664, ¶ 2 (1992) (inquiring whether hearing "criteria have become too subjective and imprecise to be used effectively in the public interest"). Accordingly, in 1995, the Commission froze all proceedings on pending applications for broadcast licenses and initiated an inquiry into possible improvements to the selection processes. *See Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Notice of Proposed Rulemaking, 10 FCC Rcd 2877, 2879, ¶ 14 (1995).

In 1997, while the agency rulemaking was ongoing, Congress authorized the FCC to allot commercial broadcast licenses by auction rather

than by the existing criteria-based selection process. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 3002, 111 Stat. 251 (codified at 47 U.S.C. § 309(j)). After notice and comment, the Commission implemented an auction system for commercial stations. *See Competitive Bidding for Commercial Broadcast and ITFS Licensees*, Report and Order, 13 FCC Rcd 15920 (1998) (*Competitive Bidding Order*).

Congress explicitly prohibited the FCC from auctioning spectrum for noncommercial educational stations, however. *See* 47 U.S.C. §§ 309(j)(2)(c) & 397(6). In 1998, the Commission therefore called for comment on possible improvements to the process for awarding noncommercial educational licenses, including the options of using a lottery or using a points system. *See NCE NPRM*, 13 FCC Rcd at 21170, ¶ 7.

## B.   The Present Noncommercial Educational FM Radio License Framework

In 2000, after extensive comments representing the views of over 100 organizations, the Commission adopted a points system for the award of noncommercial educational licenses. *Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, Report and Order, 15 FCC Rcd 7386, 7391, ¶¶ 5-7 (2000) (*NCE Order*).

Under this system, the Commission first considers the "fair distribution of stations to communities as a threshold issue," and, where that factor is not

dispositive, selects the application that receives the most points based on a number of other objective criteria. *Id.* at 7395, ¶ 19; *see* 47 C.F.R. §§ 73.7000-73.7005. The Commission found that this system would "eliminate the vagueness and unpredictability of the [previous] system, clearly express the public interest factors that the Commission finds important in [noncommercial educational] broadcasters, and select the applicant who best exemplifies these criteria." *NCE Order*, 15 FCC Rcd at 7394, ¶ 18. The Commission also concluded that this objective system "would reduce the costs and time associated with comparative proceedings both for applicants and the Commission." *Id.*

### 1.    Threshold Fair Distribution Preference Inquiry

Under Section 307(b) of the Act, the Commission must distribute radio licenses "among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same." 47 U.S.C. § 307(b). Under the previous system of comparative hearings for noncommercial educational FM radio licenses, an ALJ could give weight, as one criterion among several, to the fact that an applicant proposed to provide service to an area that had no noncommercial educational service, or had only one other noncommercial educational station. *See New York University*, 10 Rad. Reg. 2d (P&F) 215, 217, ¶ 8 (1967) (FCC Add. 2). Although the ALJ

7

was "permitted to give whatever weight he deem[ed] appropriate" to these Section 307(b) factors, *id.,* in practice, this consideration could be dispositive when it was significant. *See, e.g., Applications of Real Life Educ. Found. of Baton Rouge, Inc., Jimmy Swaggart Ministries*, 6 FCC Rcd 2577, 2579, ¶ 11 (Rev. Bd. 1991).

Under the revised system, the Commission now evaluates the fair distribution of service as a threshold criterion. *See NCE Order*, 15 FCC Rcd at 7398, ¶ 24; 47 C.F.R. § 73.7002.  Specifically, when competing applicants propose to serve different communities with mutually exclusive noncommercial educational FM radio licenses, the Commission awards a dispositive preference to an applicant that provides the first or second noncommercial educational signal to at least 10 percent of the people within the service contours of its station, provided that this percentage represents at least 2,000 people.  47 C.F.R. § 73.7002.  If more than one applicant passes this threshold, the applicant providing first or second noncommercial educational service to the most people is selected, provided that the difference in service between the applicants is at least 5,000 people.  *Id.*  If multiple applicants are equivalent under this test, those applicants move on to the next stage of selection, based on points.  Likewise, if no applicant passes this threshold, all move on to that next stage.

In the *NPRM*, the FCC had proposed considering fair distribution as part of the points system, awarding points for first or second noncommercial educational service, as opposed to a potentially dispositive threshold. *NCE NPRM*, 13 FCC Rcd at 21177, ¶ 21. "Upon consideration of the comments," however, the Commission decided to evaluate fair distribution of service at the threshold. *NCE Order*, 15 FCC Rcd at 7396, ¶ 24. The agency noted that this framework was more consistent with its previous approach—where significant differences under the Section 307(b) criterion could be dispositive—as well as its approach in other contexts, such as its then-recently-adopted rules for commercial AM radio, where the agency also evaluates fair distribution as a threshold criterion before proceeding to competitive bidding if appropriate. *See id.*; *see also Competitive Bidding Order*, 13 FCC Rcd at 15964, ¶ 120 (assessing fair distribution at the threshold avoids "subordinat[ing] the 'needs of the community' to the 'ability of an applicant for another locality'" (quoting *FCC v. Allentown Broadcasting Corp.*, 349 U.S. 358 (1955))).

However, the FCC agreed with commenters that differences between proposals in first or second noncommercial educational service "should be decisional only if they are significant." *NCE Order*, 15 FCC Rcd at 7397, ¶ 25. One commenter had proposed a threshold based on first or second

noncommercial educational service to 5 percent of the population served or a 2,000 person minimum. *Id.* The agency "generally concur[red] with this suggestion, and with the 2,000 person minimum, but believe[d] that the percentage difference in population coverage must be greater if it is to distinguish between applications in well populated areas, as a threshold matter." *Id.* To address this concern, the agency set the threshold at 10 percent of the population served. *Id.* The agency also required that an applicant satisfy the 10 percent threshold *and* that this percentage represent at least 2,000 people. It recognized that, because of this relatively high threshold, "there may not be a large number of cases in which Section 307(b) issues will be dispositive." *Id.* at 7397, ¶ 24.

To ensure that communities actually receive the benefits in question, the FCC requires that any station that receives a license based on the Section 307(b) threshold build and operate its service as proposed, and not reduce service to its proposed community for at least four years. *Id.* at 7398, ¶ 27.

### 2.    Second-Stage Points-Based Comparison

If an applicant is not chosen by application of the fair distribution threshold, all remaining applicants are evaluated on points awarded on the basis of four other factors, as follows:

- *Diversity of Ownership* (2 points) – awarded where the proposed service area does not overlap with another service area controlled by the same entity.

- *Technical Parameters* (1-2 points) – one point awarded if an applicant serves at least a 10 percent greater area and 10 percent greater population than other applicants; two points awarded with a 25 percent greater area and population.

- *Localism* (3 points) – awarded where an applicant is physically headquartered, has a campus, or has 75 percent of its board members residing within 25 miles of the center of the proposed service area.

- *State-Wide Network Credit* (2 points) – awarded to an entity with authority over at least 50 elementary or secondary schools within a state or at least 5 higher-learning campuses within a state.

*See NCE Order*, 15 FCC Rcd at 7393-7413, ¶¶ 15-61; 47 C.F.R. § 73.7003; *American Family Ass'n, Inc. v FCC*, 365 F.3d 1156 (D.C. Cir. 2004) (discussing points system).  The candidate with the most points is awarded the license, with further provisions for tie-breaking.  *NCE Order*, 15 FCC Rcd at 7416-18, ¶¶ 69-74.

11

### C.   Subsequent History of the 2000 NCE Rules

In 2001, the Commission responded to a number of petitions for

clarification and administrative reconsideration.  *See Reexamination of the*

*Comparative Standards for Noncommercial Educational Applicants*,

Memorandum Opinion and Order, 16 FCC Rcd 5074 (2001) (*NCE Recon*

*Order*).  On reconsideration, the agency confirmed its decision to evaluate

fair distribution of service as a threshold matter, rather than as part of the

points system.  *Id.* at 5088, ¶ 38.  As the Commission explained, although

under the previous system of comparative hearings, the ALJ had discretion to

give "whatever weight he deemed appropriate" to Section 307(b) fair

distribution considerations,  in practice, "307(b) issues [could] be dispositive

[under the previous system], as long as the differences [were] not slight." *Id.*

The agency explained that its new threshold rules likewise "ensured that only

significant 307(b) differences are decisional."  *Id.*  When applicants "have

only small differences," as assessed under the threshold, their applications are

evaluated under the points system.  *Id.*

The *NCE Order* was twice challenged in court.  No one challenged the

fair distribution threshold.  In *National Public Radio, Inc. v. FCC*, 254 F.3d

226 (D.C. Cir. 2001), this Court held that the Commission could not require

noncommercial educational applicants to participate in auctions when they

12

vied for licenses in unreserved spectrum alongside commercial operators.  *Id.* at 227.  In *American Family Association, Inc. v. FCC*, 365 F.3d 1156 (D.C. Cir. 2004), this Court upheld the rules against challenges that certain aspects of the points system were irrational, or inconsistent with the Act, or unconstitutional under the free speech or free exercise clauses of the First Amendment.  *Id.* at 1163, 1168.

### D.   Order Under Review

#### 1.   Initial Applications

Intervenor Holy Family Communications, Inc. and Appellant Mary V. Harris Foundation filed mutually exclusive applications for noncommercial educational FM radio stations in upstate New York in September 1996 and May 1997, respectively.  *See Holy Family Application* (JA___); *Harris Foundation Application* (JA__).   Because the Commission had instituted a freeze on processing applications while it considered reform of its license assignment procedures, *see* p. 5 above, no further action was taken on those applications until after the *NCE Order* set out the new framework.  The *NCE Order* then directed applicants like the Harris Foundation and Holy Family to file "points supplements" providing the additional information necessary to

evaluate the pending applications under the new points system.  *NCE Order*,

15 FCC Rcd at 7424, ¶ 91.[1]

Both Holy Family and the Harris Foundation timely filed points

supplements.  *See Holy Family Points Supplement* (JA__); *Harris*

*Foundation Points Supplement* (JA__).  In those supplements, both applicants

disavowed entitlement to a Section 307(b) fair distribution preference

because neither would provide the first or second noncommercial educational

FM radio service to at least 10 percent of their service population.  *Id.*  The

Harris Foundation also did not request a waiver of the fair distribution

threshold.

### 2.   Omnibus Order

In March 2007, the Commission issued decisions on seventy-six

pending noncommercial educational FM radio licenses, including the

applications at issue here.  *See Comparative Consideration of 76 Groups of*

───────────────────

[1] The Commission explained that it would evaluate the technical aspects of proposals—such as the coverage area and strength—as of the date the applications were originally submitted.  This was necessary because the staff had already designated the groups of mutually exclusive applications based on the coverage claimed in the previously-filed applications, and any amendments would require review of all these groups, leading to further delay.  *NCE Recon Order*, 16 FCC Rcd at 5085, ¶ 31.  For purposes of evaluating applications under the Section 307(b) threshold, however, the Commission explained that it would use current census data as of the date on which the points supplements were filed because that would be more accurate and easier.  *Id.* at ¶ 32.

*Mutually Exclusive Applications for Permits to Construct New or Modified Noncommercial Educational FM Stations*, Memorandum Opinion and Order, 22 FCC Rcd 6101 (2007) (*Omnibus Order*) (JA__).  Because the Harris Foundation and Holy Family "each certified that it would not qualify for a Section 307(b) preference," "[t]he applications…proceed[ed] to a point hearing." *Id.* at ¶ 97 (JA__).  Holy Family was awarded three points as an established local applicant and two points for diversity of ownership, for a total of five points. *Id.* at ¶ 98 (JA__).  The Harris Foundation was awarded two points for diversity of ownership for a total of two points. *Id.*  Neither was awarded points for the best technical proposal because they proposed to serve approximately equal areas (though the Harris Foundation would serve a greater population).[2] *Id.*  Because Holy Family was awarded more points, it was tentatively selected as the licensee, subject to petitions for denial. *Id.* at ¶¶ 2, 98 (JA__, __); 47 C.F.R. § 73.7004.

Although the Harris Foundation did not petition for waiver of the 10 percent threshold for a fair distribution preference in its points supplement, another party in a different mutually exclusive group had argued that its own

---

[2] Holy Family's proposed service area encompassed 228 square kilometers with a population of 93,427.  The Harris Foundation's proposed service area encompassed 204 square kilometers with a population of 300,673.  Points are awarded only if one applicant's proposal exceeds the other's by 10 percent of *both* area and population.  *Id.*

"'anomalous' situation…warrant[ed] award of a fair distribution preference."
*Id.* at ¶ 28 (JA__).  Central Florida Educational Foundation, Inc. (Central Florida) stated it would provide first or second noncommercial educational service to almost 25,000 people—9.33 percent of its service population— which, Central Florida pointed out, was close to the 10 percent benchmark and "far exceeded" the 2,000 person minimum.  The Commission rejected the request and explained that this argument for a waiver "reflects a misunderstanding of the [noncommercial educational] Section 307(b) eligibility standard," in which both the 10 percent threshold and the 2,000 person minimum were important and served different purposes.  *Id.* at ¶ 30 (JA__).  As the agency explained:

> These two components work in tandem to make the standard meaningful regardless of community size. In well-populated service areas such as Central's, the ten percent component ensures that Section 307(b) eligibility is limited to NCE applicants offering new service to a significant portion of the relatively large population. In contrast, the 2,000 person component is designed for small communities to ensure that trivial service differences are not treated as dispositive. It would be neither "odd" nor "anomalous" for an applicant in a populated area to propose first and second service to a population well in excess of 2,000 yet fail to qualify for a Section 307(b) preference because it falls short of the ten percent benchmark.

*Id.*  The agency therefore denied Central Florida's request for a waiver of the fair distribution preference threshold, and the applications in that group advanced to a decision based on points.  *Id.*

16

### 3.    The Harris Foundation's Administrative Appeals

The Harris Foundation filed a petition to deny Holy Family's license.
*See Harris Foundation 2007 Petition to Deny* (JA__).  Among other
contentions, the Harris Foundation argued that the FCC should award it a
dispositive fair distribution preference based on its second noncommercial
educational service to 9.46 percent of its population.  It admitted that this
"does not quite reach the 10% threshold," but argued that "it comes very
close" and "would serve the public interest by bringing a second service to a
substantially larger number of people."  *Id.* at 5 (JA__).

The Media Bureau (Bureau) rejected this argument as "not
compelling."  *Mary V. Harris Foundation*, 22 FCC Rcd 18931, 18934 (MB
2007) ("*Bureau Letter Decision*") (JA__).  The Bureau first pointed out that
the Commission had denied Central Florida's request for a waiver in similar
circumstances in the *Omnibus Order*.  In response to the Harris Foundation's
argument that the ten percent threshold was arbitrary, the Bureau pointed out
that the agency "must necessarily draw numerical lines in establishing
threshold qualifications, and has the discretion to do so."  *Id.* at 4-5 (JA__).
In setting the threshold at 10 percent, the agency "took into account that
applicants receiving a fair distribution preference can prevail on that basis

17

alone" and therefore "established standards to ensure that only the most significant differences would be decisional." *Id.* at 5 (JA___).

The Harris Foundation also argued that the 10 percent threshold was inefficient because, had it been permitted to amend its application, it might have done so in order to reduce its total service area but increase the percentage of its coverage as first or second noncommercial educational service. *Harris Foundation 2007 Petition to Deny* at 6 (JA___). The Bureau found this "immaterial" because, under the *NCE Order*, applicants with then-pending applications could not make alterations to their coverage area, and more generally, "[t]he Commission's procedures encourage applicants to apply for the facilities that they wish to construct." *Bureau Letter Decision* at 5 (JA___).

The Bureau did agree with the Harris Foundation that, based on new engineering data, Holy Family in fact did not qualify for the two points it had been awarded for diversity of ownership. *Id.* Holy Family argued that the overlap between the coverage area of its proposed operations and existing operations of less than one square kilometer was *de minimis* and merited a waiver. *Id.* In opposition, the Harris Foundation argued that a waiver would be inappropriate because the overlap was a result of Holy Family's own engineering choices and Holy Family had not shown waiver would be in the

18

public interest.  *Id.*   The Bureau agreed that a waiver was inappropriate and therefore deducted two points from Holy Family's tally.  *Id.*  Because Holy Family still had three points to the Harris Foundation's two, however, this did not change the outcome.  *Id.* at 6 (JA__).

The Harris Foundation then petitioned the Bureau for reconsideration. *See Harris Foundation 2007 Petition for Reconsideration* (JA__).  The Bureau found that the Harris Foundation did not present new arguments or facts to support its plea for a waiver of the 10 percent threshold, and therefore declined to reconsider its previous decision.  *See 2011 Reconsideration Decision* ¶ 4 (JA __).

The Harris Foundation then petitioned the full Commission for review. *See Harris Foundation 2011 Application for Review* (JA__).  It again argued that the 10 percent threshold "serves little practical purpose," and that the Commission should award a dispositive fair distribution preference to the Harris Foundation because it would provide the second noncommercial educational service to a greater number of people than Holy Family, "which should be the Commission's objective."  *Id.* at 5-7 (JA__).  The Commission found the Bureau had "properly decided the matters raised" by the Harris Foundation and upheld the previous decisions based on the reasoning set out there.  *Commission Order* ¶ 2 (JA__).

19

The Harris Foundation petitioned the Commission for reconsideration. *See Harris Foundation 2013 Petition for Reconsideration* (JA__).  It pressed essentially the same argument, and the Bureau, on behalf of the Commission,[3] dismissed the Petition as repetitious.  *2013 Reconsideration Order* ¶ 7 (JA__). This appeal followed.

## SUMMARY OF ARGUMENT

In the *NCE Order*, promulgated over thirteen years ago, the FCC established a simple, bright-line rule to award a potentially dispositive preference to a noncommercial educational FM radio license application where the applicant provides the first or second noncommercial educational signal to at least 10 percent of the people within the proposed station's service contour.  In the *Order* under review, the agency determined that the Harris Foundation, which proposed to provide such service to only 9.46 percent of the people within its service area, did not qualify for the preference.  The Commission's determination was a straightforward application of its bright-line rule, and should be upheld.

---

[3] FCC rules provide that a Bureau may dismiss a petition for reconsideration of a Commission decision affirming a prior Bureau decision if the petition fails to rely on new facts or changed circumstances.  47 C.F.R. §§ 1.106(b)(3) & 1.106(p)

**I.**     The FCC's objective test for whether and when to award a dispositive preference is a reasonable interpretation of the competing goals set out in Section 307(b), which requires an "equitable," "efficient," and "fair distribution" of radio licenses.  As the Harris Foundation itself noted in the proceeding below, the Commission "explained that the formula is designed to balance the opportunities for new stations in both large and small communities."  *Harris Foundation 2007 Petition to Deny* at 6 (JA__).  The 10 percent component of the threshold ensures that "[i]n well populated service areas" "Section 307(b) eligibility is limited to [noncommercial educational] applicants offering new service to a significant portion of the relatively large population."  *Omnibus Order* ¶ 30 (JA__).  A test that simply counted noses without a percentage would unduly favor applicants in more populous areas at the expense of applicants in less populous ones.

The Harris Foundation claims that the Commission's 10 percent threshold is contrary to Section 307(b)'s requirement that the agency distribute licenses "efficient[ly]"—a standard that the Harris Foundation appears to equate with maximizing the number of listeners above all else. But Section 307(b) also requires an "equitable" and "fair distribution" among communities, and the agency has discretion to balance these objectives.  A system that concentrates solely on "service for the maximum number of

21

people," as the Harris Foundation urges (Br. 23), would run counter to the statute.  And, contrary to the Harris Foundation's argument (Br. 28-31), the rules do not encourage applicants to submit proposals that shrink coverage in order to raise the percentage of new service.  Because the rules prefer applicants who serve more people if more than one applicant passes the threshold or if no one passes the threshold, any applicant who purposely sought to shrink its coverage area would risk losing out to a competing applicant that proposed to serve more people.

The agency was also reasonable in adopting these rules as a departure from the previous regime.  The agency explained that a system of a bright-line threshold and points would be both more objective and more efficient than the prior flawed system of comparative hearings.

**II.**     The agency did not abuse its discretion in refusing to waive the ten percent threshold for the Harris Foundation.  Every bright-line rule may present cases in which an applicant is close to, but short of, the threshold.  The Harris Foundation presented no reason to look past this clear line.  As the agency explained, it was hardly "anomalous" that the Harris Foundation— which proposed to serve a more populous area than Holy Family—did not qualify for the fair distribution preference even though it would provide new noncommercial educational service to more people.  The very point of the 10

22

percent threshold is to avoid unduly preferring applications serving large communities.  Indeed, the agency had already denied a petition to waive under circumstances that the Harris Foundation did not meaningfully distinguish.

**III.**     Finally, under well-settled precedent, the Harris Foundation is barred from now arguing that the 2000 *NCE Order* provided inadequate notice and opportunity to comment on the ten percent threshold.  Such a procedural challenge must be raised at the time a rule is originally promulgated; it cannot be revived now that the rule has been in effect for more than a decade.  *JEM Broad. Co., Inc. v. FCC*, 22 F.3d 320, 325 (D.C. Cir. 1994).  In any case, the ten percent threshold is a logical outgrowth of the Notice of Proposed Rulemaking, where the agency proposed an objective test for the fair distribution of service and made clear more generally that it aimed to construct rules that did not unduly favor applicants serving more populous areas.  It was hardly a major shift, then, when the Commission adopted a modified version of a party's proposal in the rulemaking record to use a percentage threshold to accomplish precisely those goals.

**STANDARD OF REVIEW**

In the *Order* on review, the Commission upheld the Bureau's application of the fair distribution threshold, a rule issued in the 2000 *NCE*

23

*Order*.  The Harris Foundation attacks both the underlying rule and its application here.  Its argument that the fair distribution threshold is contrary to Section 307(b) is reviewed under the familiar framework of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Under that standard, where Congress has not "unambiguously expressed [its] intent," the Court asks "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

The Harris Foundation also argues that the agency was arbitrary and capricious in adopting the fair distribution threshold.  The Court's review under the arbitrary and capricious standard of the APA, 5 U.S.C. § 706(2)(A), is "necessarily deferential."  *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 300 (D.C. Cir. 2003).  The Court will "presume the validity of the Commission's action and will not intervene unless the Commission failed to consider relevant factors or made a manifest error in judgment." *Id.* Moreover, an agency is not subject to "more searching review" or a "heightened duty" when it changes course from a previous policy—it need only provide an adequate explanation for the new one.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Finally, this Court "will vacate the [Commission's] denial of a waiver 'only when the agency's reasons are so insubstantial as to render that denial

an abuse of discretion.'"  *Blanca Tel. Co. v. FCC*, 743 F.3d 860, 864 (D.C.

Cir. 2014) (quoting *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1181

(D.C.Cir.2003)).

## ARGUMENT

### I.      THE FAIR DISTRIBUTION THRESHOLD IS LAWFUL.

#### A.   The FCC reasonably interpreted Section 307(b) in instituting the fair distribution threshold.

The Harris Foundation argues that the 10 percent portion of the fair

distribution threshold is an unlawful implementation of Section 307(b).  Br.

23-31.  That Section tasks the Commission with "mak[ing] such distribution

of [broadcast] licenses...among the several States and communities as to

provide a fair, efficient, and equitable distribution of radio service to each of

the same."  47 U.S.C. § 307(b).   Because "[t]he text of § 307 is silent

regarding…what the Commission should consider in making § 307(b)

determinations," "the Supreme Court has underscored the scope of the

Commission's discretion" in carrying out these duties.  *Alvin Lou Media, Inc.

v. FCC*, 571 F.3d 1, 11 (D.C. Cir. 2009) (citing *FCC v. Allentown Broad.

Corp.*, 349 U.S. 358, 362 (1955)).  The Harris Foundation must therefore

establish at *Chevron*'s step two that the fair distribution threshold is

"impermissible" under the language of Section 307(b).  *Alvin Lou Media*, 571

F.3d at 11.  It cannot do so.

25

1.      The rules set out in the *NCE Order*—including the fair distribution threshold—represent a reasonable balancing of the competing goals of "equit[y]," "fair[ness]" and "efficien[cy]" set out by Section 307(b). *See* 47 U.S.C. § 307(b).   The agency explained that it chose an objective system of the 10 percent threshold and a points framework in order to "eliminate the vagueness and unpredictability of the [previous] system," while at the same time "clearly express[ing] the public interest factors that the Commission finds important in [noncommercial educational] broadcasters." *NCE Order*, 15 FCC Rcd at 7394, ¶ 18.  A system of clear objective rules likewise promised to "reduce the costs and time…both for applicants and the Commission" in evaluating mutually exclusive applications for noncommercial educational licenses.  *Id.*

The FCC chose a potentially dispositive 10 percent and 2,000 person threshold for first or second noncommercial educational service, as opposed to simply awarding points as part of the points proceeding, because that approach "would be most consistent with [its then-]existing Section 307(b) approach, which [had] been upheld in court." *Id.* at 7398, ¶ 24.  For example, in *Allentown Broadcasting*, which the agency cited, *id.*, the Supreme Court upheld the allocation of a license as a threshold matter to a community

without service, even though a competing applicant had a superior application if judged on other, technical grounds. *See* 349 U.S. at 361-62.

At the same time, the FCC in the *NCE Order* "agree[d] with commenters that [fair distribution] differences between proposals should be decisional only if they are significant." *NCE Order*, 15 FCC Rcd at 7396, ¶ 25. To secure this goal, the agency set out a two-part fair distribution threshold—applicants must provide first or second noncommercial educational service to at least 2,000 people *and* the people receiving such service must constitute at least 10 percent of the total population served. *Id.* The 10 percent component is necessary in order to "distinguish between applicants in well populated areas." *Id.* As the agency elaborated in denying a waiver of the 10 percent requirement in the *Omnibus Order*, "[i]n well populated service areas…, the ten percent component ensures that Section 307(b) eligibility is limited to [noncommercial educational] applicants offering new service to a significant portion of the relatively large population." *Omnibus Order* ¶ 30 (JA__). Otherwise, an applicant in a more populous area would be much more likely to receive a fair distribution preference than a competing applicant from a comparatively rural one. Such a bias in favor of more populous areas would undermine the purpose of the statute to assure fair distribution to all communities. *See Pasadena Broad.*

*Co. v. FCC*, 555 F.2d 1046, 1050 (D.C. Cir. 1977) (Section 307(b) was enacted to combat the "[c]oncentration of radio service in the big city").

**2.**    The Harris Foundation argues that the FCC's 10 percent threshold conflicts with Section 307(b), for two reasons (Br. 23-31), but both fail to establish that the agency's reading of Section 307(b) is "impermissible." *See Alvin Lou Media*, 571 F.3d at 11.

*First*, the Harris Foundation argues that the 10 percent threshold does not promote an "efficient" allocation of spectrum, as required by Section 307(b), because it is not focused solely on "the raw objective number of people being served." Br. 26. But such a myopic focus would run afoul of the remainder of Section 307(b), which requires a "fair" and "equitable" distribution of licenses. As this Court explained, Congress did not intend that a "license is [always] to be awarded to the applicant who would encompass the most listeners within the range of his signal. If that were so, all frequencies likely would be assigned sooner or later to powerful stations in major population centers—precisely the result Congress meant to forestall by means of Section 307(b)." *Pasadena Broad. Co.*, 555 F.2d at 1049-50. So too here. A policy which automatically awarded a dispositive preference to an applicant serving the greater number of listeners, without taking into

account the percentage of listeners, would be unfairly biased in favor of applicants with "well populated service areas." *Omnibus Order*, ¶ 30 (JA__).

This is not to say the Commission failed to account for efficiency. If more than one applicant would provide first or second noncommercial educational service to more than 10 percent of its population, then a candidate that provides such service to at least 5,000 more people will receive the preference. *NCE Order*, 15 FCC Rcd at 7397, ¶ 25. Moreover, efficiency encompasses not just which station provides the first or second noncommercial educational service, but also which station provides noncommercial educational service to the most people or largest area generally, regardless of the noncommercial educational service already available. As the Commission explained, this factor is accounted for by the "technical factor" of the points system, which awards up to two points if an applicant serves a significantly greater area and population. *NCE Reconsideration Order*, 16 FCC Rcd at 5088, ¶ 38; *see* p. 11 above. Although a dispositive award for satisfying the fair distribution threshold cuts off this efficiency consideration, where applicants present no "significant 307(b) differences" the rules take account of efficiency through the technical factor of the points system. *Id.*

29

*Second,* the Harris Foundation argues that the rules are inconsistent

with Section 307(b) because they fail to secure an "equitable" and "fair

distribution" of service.  Br. 28-31.  It alleges that, had it been allowed to

alter its proposal in response to the *NCE Order*, it could have done so in a

way that would have increased the *percentage* of listeners receiving first or

second noncommercial educational service while simultaneously shrinking

the *total number* of listeners—which, it asserts, would somehow be

inequitable or unfair within the meaning of Section 307(b).  Br. 28-31.

Putting aside whether such a result would suffice to show that the threshold is

an unreasonable interpretation of the statute—which is far from clear—the

hypothetical is baseless because (1) it could not have occurred here, and (2) it

is unlikely to occur anywhere.

    As the Harris Foundation concedes (Br. 29), the gamesmanship of

which it warns could not actually have happened in this case.  Under the *NCE

Order*, applicants with then-pending applications, such as the Harris

Foundation and Holy Family, were not permitted "to alter their technical

proposals…for purposes of enhancing their comparative positions."  *Letter

Decision* at 5 (JA__); *see NCE Recon Order*, 16 FCC Rcd at 5085-86, ¶ 31.

    In any event, even if framed as a facial challenge—and it is unclear if

the Harris Foundation is making such an argument—such a hypothetical is

unlikely even going forward with new applications.  Under the rules, an

applicant chooses a restricted service area at its own peril.  When more than

one applicant passes the 10 percent threshold, the applicant that provides first

or second noncommercial educational service to the most listeners is selected,

as long as the difference is at least 5,000 people.  47 C.F.R. § 73.7002(b).

And where the threshold is not dispositive, candidates receive points under

the "technical" factor for serving significantly more listeners and area.  *Id.* at

§ 73.7003(b)(4).  Because an applicant may need to vie against another

applicant based on these factors, a candidate is unlikely to gain an advantage

by purposely shrinking its service area solely to qualify for the fair

distribution threshold.  Through these safeguards, "[t]he Commission's

procedures encourage applicants to apply for the facilities that they wish to

construct." *Letter Decision* at 5 (JA___).[4]

---

[4] For the same reason, the rules do not encourage applicants to propose
service to a high percentage of first and second noncommercial educational
service "in a relatively small service area" in order to win a fair distribution
preference, and then "later enlarge the service area after the construction
permit is issued" by the agency, as the Harris Foundation alleges.  Br. 31.
Putting aside whether this would even be permissible given the holding
period required by the rules, *see* 47 C.F.R. § 73.7005(b), an applicant cannot
be confident it will receive the dispositive preference in the first place.

**B.   The FCC reasonably explained its decision to implement the fair distribution threshold.**

In addition to arguing that the 2000 rules are inconsistent with the statute, the Harris Foundation also argues that the FCC acted arbitrarily and capriciously in implementing the fair distribution threshold by failing to explain those rules.  Br. 31-38.  The Court's review under the arbitrary and capricious standard is "necessarily deferential," and the Court "will not intervene unless the Commission failed to consider relevant factors or made a manifest error in judgment."  *Consumer Elecs. Ass'n*, 347 F.3d at 300.  Moreover, an agency is not subject to "more searching review" or a "heightened duty" when it changes course from a previous policy, provided it "display awareness that it *is* changing position" and provides a reasonable explanation for the new policy.  *Fox Television*, 556 U.S. at 515.

To be sure, the 10 percent threshold and points system represented a departure from the prior procedure, including the prior policy that "permitted [an ALJ] to give whatever weight he deem[ed] appropriate" to Section 307(b) factors. *New York University*, 10 Rad. Reg. 2d at 217, ¶ 8 (FCC Add. 2).  But the FCC acknowledged and explained this change of course.  It explained that the new rules would "eliminate the vagueness and unpredictability of the [previous] system" with a framework that is both more objective and more efficient.  *NCE Order*, 15 FCC Rcd at 7394, ¶ 18.  The agency specifically

32

found that the new fair distribution threshold "is more readily adapted to [the noncommercial educational] points system, and more consistent with [the] ongoing goal to evaluate applications quickly, with minimal burden on applicants and on the staff." *Id.* at 7397, ¶ 21.

Indeed, the Harris Foundation conceded in a pleading before the FCC that the agency had "explained that the formula is designed to balance the opportunities for new stations in both large and small communities," a goal the Harris Foundation described as "worthy." *Harris Foundation 2007 Petition to Deny* at 6 (JA__). The Harris Foundation would prefer that the agency strike a different balance, but Congress has delegated discretion to the agency in balancing these goals. *See Alvin Lou Media*, 571 F.3d at 11.[5]

---

[5] Contrary to the Harris Foundation's argument (Br. 37-38), the use of a percentage threshold is fully consistent with the FCC's recent adoption of a rule in favor of applicants owned or controlled by Indian Tribes who provide the first noncommercial educational service to Tribal lands. *See* 47 C.F.R. § 73.7002(b); *Policies to Promote Rural Radio Service and to Streamline Allotment and Assignment Procedures*, First Report and Order, 25 FCC Rcd 1583, 1587-89, ¶¶ 7-10 (2010). In the case of the Tribal preference, there is no need to compare applicants using a percentage threshold of first or second noncommercial educational service because the Tribal rule is already constructed to favor applicants who serve these sparsely populated areas. *See id.* at 1587, ¶ 8. Therefore, in the perhaps unlikely event that more than one applicant seeks to provide the first noncommercial educational service to these historically unserved areas, it is rational to pick the candidate that would serve the most people on Tribal lands.

## II.   THE COMMISSION DID NOT ABUSE ITS DISCRETION IN DENYING A WAIVER OF THE 10 PERCENT THRESHOLD.

Conceding that it does not qualify for the 10 percent dispositive preference by its terms (Br. 38), the Harris Foundation next argues that the agency erred in not waiving the rule and awarding it a dispositive preference anyway.  Br. 38-41.  This Court's review in such cases is "extremely limited"— it will "vacate the denial of a waiver only when the agency's reasons are so insubstantial as to render that denial an abuse of discretion." *Blanca Tel. Co.*, 743 F.3d at 864 (quoting *BDPCS, Inc.*, 351 F.3d at 1181).

The agency did not abuse that broad discretion here.  As the Bureau explained in denying the waiver, the Commission set the benchmark at 10 percent "to ensure that only the most significant differences would be decisional."  *Letter Decision* at 5 (JA__).   An agency "has wide discretion to determine where to draw administrative lines," *AT&T Corp. v. FCC*, 220 F.3d 607, 627 (D.C. Cir. 2000), and, as the Bureau explained below, it "must necessarily draw numerical lines in establishing threshold qualifications." *Letter Decision* at 4-5 (JA__).  Any bright-line rule can create cases in which a candidate is close to, but short of a line, but that alone is not good cause for a waiver.  *See BellSouth Corp. v. FCC*, 162 F.3d 1215, 1225 (D.C. Cir. 1999) (waiver of bright-line rule not merited where "a waiver applicant seeks to

34

circumvent a rule merely because it does so only minimally"). In this case, the agency moved to a set of objective rules both to promote efficiency and to mitigate the arbitrary nature of the previous regime. *NCE Order*, 15 FCC Rcd at 7396, ¶ 22. Waiver of those rules in close cases, without further extenuating circumstances, would compromise those goals.[6]

The Bureau also found that the Harris Foundation's plea for a waiver was not meaningfully different from that of Central Florida, which the Commission had already denied. *Letter Decision* at 4 (JA__); *see* pp. 15-16 above. Central Florida had likewise argued that it merited a fair distribution preference because it would offer new noncommercial educational service to close to 10 percent of its population and more people than its competitors. As the Commission explained, there was nothing "anomalous" about such a situation—an applicant in a more populous area is likely to provide

---

[6] Indeed, in this same proceeding, the Bureau also declined a request from Intervenor Holy Family to waive a different "de minimis" failure to satisfy the rules—a denial with which the Harris Foundation agreed. *Letter Decision* at 5 (JA__). In that instance, Holy Family argued that the Bureau should overlook the one-square-kilometer overlap in the service area of its proposed and existing operations. *Letter Decision* at 5 (JA__). The Bureau refused, explaining that even a de minimis overlap was cognizable under the rules. *Id.*; *see also Harris Foundation Reply to Opposition to Petition to Deny* at 5 (JA__) (where a party seeks a "waiver in order to obtain a benefit," FCC practice is to deny "even when the violation might be characterized as 'de minimis'").

noncommercial educational service to more people, and the purpose of the 10 percent threshold is to ensure that such an application is not unfairly preferred over those of applicants in comparatively sparsely populated areas. *Omnibus Order* ¶ 30 (JA__). The same logic applied in this case. *Letter Decision* at 4 (JA__).

Moreover, granting a fair distribution preference based on differences in proposed new service that are not "significant" under the rules would wholly cut off consideration of other regulatory objectives that are evaluated under the points system, such as diversity of ownership and local control. The FCC set a relatively high threshold recognizing that "there may not be a large number of cases in which Section 307(b) issues will be dispositive." *NCE Order*, 15 FCC Rcd at 7397, ¶ 24. A waiver here would have compromised the agency's interest in furthering the other objectives secured by the points system, as well as Holy Family's interest in seeing the rules neutrally applied so that it could vie for the license under that system.

In short, enforcement of the 10 percent threshold serves, rather than undermines, the purposes of the fair distribution rule. Because the Harris Foundation did not show good cause for a waiver, it cannot show that the Commission abused its discretion here.

### III.  APPELLANT'S NOTICE-AND-COMMENT CHALLENGE IS UNTIMELY AND, IN ANY EVENT, WITHOUT MERIT.

Finally, the Harris Foundation contends that the 10 percent threshold was promulgated with inadequate notice and opportunity to comment under the APA.  Br. 41-48.  That contention is time-barred and in any event meritless.

The Hobbs Act allows a party "aggrieved" by a "final [agency] order" to petition for review "within 60 days after its entry." 28 U.S.C. § 2344.  This "statutory deadline is jurisdictional," and challenges brought after 60 days are generally time-barred.  *Cellular Telecomm. & Internet Ass'n v FCC*, 330 F.3d 502, 508 (D.C. Cir. 2003).  This Court has recognized an exception when a party in an enforcement action challenges the *substantive* validity of a rule in question.  *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958).  However, "challenges to the *procedural lineage of agency regulations*, [even when] raised…as a defense to an agency enforcement proceeding, will not be entertained outside the 60–day period provided by statute."  *JEM Broad.*, 22 F.3d at 325 (emphasis in original, quotation marks and citations omitted); *see also Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999).  "'Strict enforcement of the [statutory] time limit is necessary to preserve finality in agency decisionmaking and to protect justifiable reliance on agency rules.'"

*JEM Broad.*, 22 F.3d at 326 (quoting *Raton Gas Transmission Co. v. FERC*, 852 F.2d 612, 615 (D.C.Cir.1988)).   Because the 60-day period to challenge the 2000 *NCE Order* has long passed, the Harris Foundation cannot bring a procedural challenge to the rule based on an alleged lack of notice and opportunity to comment.  Br. 41-53. [7]

The challenge would be meritless in any case because the Section 307(b) fair distribution threshold is a logical outgrowth of the discussion in the *NCE NPRM*.  "A final rule is not a logical outgrowth of a proposed rule when the changes are so major that the original notice did not adequately frame the subjects for discussion."  *Omnipoint Corp. v. FCC*, 78 F.3d 620, 631 (D.C. Cir. 1996) (quotation marks and citations omitted).  Here, the FCC framed the subject for discussion in the *NPRM* in a way that amply encompasses the 10 percent threshold that it ultimately adopted.  The agency announced that it sought an objective system that would need to account for fair distribution of service under Section 307(b), although at that time it contemplated doing so through awarding points for first and second

_____

[7] As a party with a pending application, the Harris Foundation had notice of, and standing to challenge, the *NCE Order* when it was issued.  Even had it not, however, other parties had motive and opportunity to challenge, and the interest in finality would outweigh the interest of the party against whom the rule is later enforced in bringing a procedural challenge.  *JEM Broad.*, 22 F.3d at 326.

noncommercial educational service.  *See NCE NPRM*, 13 FCC Rcd at 21177-
78, ¶ 21.  The agency also made clear more generally that it aimed to
construct rules that avoided unfairly favoring larger service populations,
explaining that it would evaluate the "technical" factors based on area as well
as population.  *Id.* at 21178, ¶ 22.  Though that specific proposal centered on
the technical factors for evaluation rather than a fair distribution threshold,
the *NCE NPRM* made clear that the FCC wished to construct rules that
balanced opportunities for applicants serving populous and less populous
areas—the concern that underlies the 10 percent threshold that the agency
eventually adopted.

The Harris Foundation concedes that the general approach adopted in
the rules "was not inconsistent" with the *NCE NPRM*.  Br. 42.  In particular,
it acknowledges that evaluating fair distribution of service as a threshold
matter is a logical outgrowth of the *NPRM* and previous practice.  *Id.*  It
complains only that parties had inadequate notice of the specific mechanism
of a 10 percent numerical threshold.  *Id.* at 43.  But as the Harris Foundation
also recognizes, the final rule responded to, and was in large part based on,
comments by a party.  Br. 50.  The FCC acted "well within its authority
when it chose" to implement its already stated objective through a numeric
threshold "based on comments" from a party.  *Omnipoint Corp.*, 78 F.3d at

39

632; *see also Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 549 (D.C. Cir.

2006).

   After all, "the notice-and-comment requirements presume that the

contours of the agency's final rule may differ from those of the rule it initially

proposes in an NPRM." *Crawford v. FCC*, 417 F.3d 1289, 1295 (D.C. Cir.

2005).  It is only those modifications that are not logical outgrowths of the

notice that require an additional notice and opportunity to comment.  Here,

the Commission made clear in its notice that it was seeking an objective

system that would account for fair distribution of service, and also made clear

more generally that it wished to avoid unduly favoring applicants serving

large populations.  It was no great surprise, then, when the agency adopted

the proposal to use a specific numeric threshold to evaluate this characteristic.

No party, including the Harris Foundation, sought to bring a notice-and-

comment challenge to the threshold at the time of the rule's adoption.  *See*

*generally NCE Recon Order*, 16 FCC Rcd at 5087-89, ¶¶ 35-44 (discussing

other challenges and requests for clarification); pp. 12-13 above (discussing

40

court challenges to the 2000 rule).[8]  The Harris Foundation brings one now, too late, not because the rule was unexpected but because it is displeased with the result of its application.

## CONCLUSION

The appeal should be dismissed in part for lack of jurisdiction, and otherwise denied.

_____

[8] The Harris Foundation's allegation (Br. 43) that the FCC "cut off" and "blocked further comment" is misplaced.  The agency issued two Orders on Reconsideration, but no one argued after the rule was issued that the 10 percent threshold is unlawful or arbitrary.  *See* p. 12 above; *see also Reexamination of Competitive Standards for Noncommercial Educ. Applicants*, Memorandum Opinion and Second Order on Reconsideration, 17 FCC Rcd 13132 (2002).

Respectfully submitted,

JONATHAN B. SALLET
ACTING GENERAL COUNSEL

DAVID M. GOSSETT
ACTING DEPUTY GENERAL
    COUNSEL

RICHARD K. WELCH
DEPUTY ASSOCIATE GENERAL
    COUNSEL

/s/ Matthew J. Dunne

MATTHEW J. DUNNE
COUNSEL

FEDERAL COMMUNICATIONS
    COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

April 30, 2014

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MARY V. HARRIS FOUNDATION,

APPELLANT,

v.

FEDERAL COMMUNICATIONS COMMISSION,

APPELLEE.

NO. 13-1304

CERTIFICATE OF COMPLIANCE

Pursuant to the requirements of Fed. R. App. P. 32(a)(7), I hereby certify that the accompanying Brief for Appellee in the captioned case contains 8,676 words.

/s/ Matthew J. Dunne
Matthew J. Dunne
Counsel
Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740 (Telephone)
(202) 418-2819 (Fax)

April 30, 2014

# ADDENDUM

**Bloomberg BNA**

**Telecommunications Law Resource Center™**
With Pike & Fischer Communications Regulation

Source: Communications Cases > Federal Communications Commission > New York University, 10 RR2d 215 (FCC 1967)

**10 RR2d 215**

**New York University**

FCC 67-673

**Federal Communications Commission**

June 07, 1967

## Headnotes

►**CA.307(E)(17)** ►**1.593(M)** ►**73.24(A)(5)**

"Boiler plate" 307(b) and standard comparative issues are not appropriate for mutually exclusive non-commercial educational applications. In the case of applications of New York University and Fairleigh Dickinson University (Teaneck, N.J.) for an FM station, any determination under the "available services" issue should be limited to available educational FM signals within the respective service areas of the two applicants. The Hearing Examiner should be permitted to give whatever weight he deems appropriate to the origination point of such signals, i.e., whether a 307(b) determination under this standard should include consideration of New York State-originated educational FM signals serving Fairleigh Dickinson's proposed New Jersey service areas, and vice versa. An issue should also be specified as to the relative integrated use of the requested FM facility proposed by each of the applicants in its overall educational operation. The standard comparative criteria (local residence, integration, broadcast experience, diversification, etc.) are virtually meaningless in a case of this type.

## Opinion

NEW YORK UNIVERSITY New York, New York, Requests: 89.1 mc, #206; 8.3 kw(H); 7.7 kw(V); 220 ft.; FAIRLEIGH DICKINSON UNIVERSITY Teaneck, New Jersey, Requests: 89.1 mc, #206; 550 w(H); 550 w(V); 500 ft. , For Construction Permits

**FCC 67-673**

**Mimeo 1260**

**Docket No. 17454, File No. BPED-742, Docket No. 17455, File No. BPED-751**

**June 8, 1967, Released; Adopted**

**June 7, 1967**

**By the Commission: (Chairman Hyde absent).**

**MEMORANDUM OPINION AND ORDER**

**By the Commission: (Chairman Hyde absent).**

1. On May 17, 1967, the Commission adopted a Memorandum Opinion and Order designating for hearing the applications of New York University (Docket No. 17454, File No. BPED-742), and Fairleigh Dickinson University (Docket No. 17455, File No. BPED-751) on Section 307(b) issues and comparative issues. [1] The background of this proceeding was set forth in that Order (FCC 67-607) and need not be repeated here. However, the Commission on its own motion on May 24, 1967, pursuant to Sec. 1.108 of the Rules, has reconsidered the aforesaid designation order and has determined that it should be modified in the following respects.

2. The designation order recites the "boiler plate" 307(b) and standard comparative issues. [2] Upon reconsideration, we do not believe that such traditional issues are appropriate in the instant case.

3. A review of the Commission's records indicates that we have not previously designated two non-commercial educational applications for comparative hearing. Accordingly, the Commission has not previously had occasion to state with specificity the precise issues which would be of decisional significance in such a proceeding. We

**FCC Add. 1**

feel it appropriate that we take this occasion to delineate appropriate issues.

4. We note that in at least one other instance there are competing non-commercial educational applicants before the Commission for a reserved educational television channel. In addition, with the lack of available spectrum becoming more pronounced, it is reasonable to assume that we will be faced with other instances in which two or more educational organizations will be compelled to proceed through the hearing process in order for one applicant to obtain a reserved FM or TV assignment.

5. Compounding the problem in this case, is the fact that the applicants are located in New York, New York and Teaneck, New Jersey, respectively. This, on its face, raises in the traditional sense a 307(b) issue. Additional 307(b) implications are raised by the disparity in power and radiation patterns proposed by the two applicants. We are not persuaded that our traditional areas and populations, and other available services criteria are appropriate in this instance, nor are we persuaded that the factors involved in the usual standard comparison [3] are appropriate in the context of this proceeding.

6. Our reconsideration is primarily founded on our desire to avoid round after round of interlocutory pleadings and appeals which would not only involve unnecessary expense to the two applicants, but would be much more wasteful than necessary of Commission staff time at the Broadcast Bureau, Hearing Examiner and Review Board levels, and of the time of the Commission itself. Therefore, we will modify the issues in this proceeding as set forth below.

7. The initial FM educational reservations were made by the Commission early in 1938. See Rules 1057 and 1058, 3 FR 312. Even at that initial stage the intention was that such a facility be made available to the applicant "for the advancement of its educational work and for the transmission of educational and entertainment programs to the general public". However, the rules then adopted also provided that a non-commercial station would be licensed "only to an organized non-profit educational agency and upon a showing that the station will be used for the advancement of the agency's educational program". The Commission has never squarely faced the question of whether these reservations were intended strictly as educational tools or were planned to be hybrid facilities to serve that end, as necessary, and during the remainder of the time to serve as additional available conventional, although non-commercial, broadcast outlets.

8. It becomes obvious from the foregoing discussion that we are faced in this proceeding with unique questions. One of the applicants has submitted material indicating that as many as 51 FM signals are available in some part of the respective service areas proposed by the two applicants. We are thus faced with the question of whether "available services" within the context of a Section 307(b) determination should include both operating commercial and educational stations. In light of our determination that the Commission's purpose in reserving educational channels at the lower end of the FM band was to establish a separate and independent service, we believe that any determination under the "available services" issue should be limited to available educational FM signals within the respective service areas of the two applicants. In addition, we believe that the Hearing Examiner should be permitted to give whatever weight he deems appropriate to the origination point of such signals: i. e., whether a 307(b) determination under this standard should include consideration of New York State-originated educational FM signals serving Fairleigh Dickinson's proposed New Jersey service areas, and vice versa. We further believe that an issue should be specified as to the relative integrated use of the requested FM facility proposed by each of the applicants in its overall educational operation. In adopting these issues in a case of first impression, we further note that our standard comparative criteria (local residence, integration, broadcast experience, diversification, etc.) are virtually meaningless in a case of this type.

9. Accordingly, it is ordered that Issues 2 and 3 are modified as follows:

Issue 2 is modified as follows:

2. To determine the number of other reserved-channel educational FM services available in the proposed service area of each applicant, and the areas and populations served thereby.

Issue 3 is modified as follows:

3. To determine the extent to which each of the proposed operations will be integrated into the overall educational operation and objectives of the respective applicants; or whether other factors in the record demonstrate that one applicant will provide a superior FM educational broadcast service.

10. In all other respects, our Memorandum Opinion and Order adopted May 17, 1967 (FCC 67-607) is affirmed.

## End Notes

[1].      An issue was also specified as to whether NYU's tower would constitute a menace to air navigation.

[2].      The standard comparative issues would be those considered within the terms of the Commission's

FCC Add. 2

Policy Statement on Comparative Broadcast Hearings, 5 RR 2d 1901

3.    See Policy Statement on Comparative Broadcast Hearings, supra.

---

Contact us at http://www.bna.com/contact/index.html or call 1-800-372-1033

ISSN 2158-8589

Copyright © 2014, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy.

**FCC Add. 3**

# STATUTORY APPENDIX

47 U.S.C. § 307(a)-(b)

47 C.F.R. § 73.7002
47 C.F.R. § 73.7003

47 U.S.C. § 307

UNITED STATES CODE ANNOTATED
TITLE 47. TELEGRAPHS, TELEPHONES, AND
RADIOTELEGRAPHS
CHAPTER 5. WIRE OR RADIO COMMUNICATION
SUBCHAPTER III. SPECIAL PROVISIONS RELATING TO RADIO
PART I. GENERAL PROVISIONS

## § 307. Licenses

(a) Grant

The Commission, if public convenience, interest, or necessity will be served
thereby, subject to the limitations of this chapter, shall grant to any applicant
therefor a station license provided for by this chapter.

(b) Allocation of facilities

In considering applications for licenses, and modifications and renewals
thereof, when and insofar as there is demand for the same, the Commission
shall make such distribution of licenses, frequencies, hours of operation, and
of power among the several States and communities as to provide a fair,
efficient, and equitable distribution of radio service to each of the same.

\*   \*   \*   \*   \*   \*

47 C.F.R. § 73.7002

CODE OF FEDERAL REGULATIONS
TITLE 47. TELECOMMUNICATION
CHAPTER I. FEDERAL COMMUNICATIONS COMMISSION
SUBCHAPTER C. BROADCAST RADIO SERVICES
PART 73. RADIO BROADCAST SERVICES
SUBPART K. APPLICATION AND SELECTION PROCEDURES
FOR RESERVED NONCOMMERCIAL EDUCATIONAL
CHANNELS, AND FOR CERTAIN APPLICATIONS FOR
NONCOMMERCIAL EDUCATIONAL STATIONS ON NON–
RESERVED CHANNELS

**§ 73.7002 Fair distribution of service on reserved band FM channels.**

(a) If timely filed applications for full service stations on reserved FM channels are determined to be mutually exclusive, and will serve different communities, the Commission will first determine, as a threshold issue, whether grant of a particular application would substantially further the fair distribution of service goals enunciated in section 307(b) of the Communications Act, 47 U.S.C. 307(b).

(b) In an analysis performed pursuant to paragraph (a) of this section, a full-service FM applicant that identifies itself as a Tribal Applicant, that proposes Tribal Coverage, and that proposes the first reserved channel NCE service owned by any Tribal Applicant at a community of license located on Tribal Lands, will be awarded a construction permit. If two or more full-service FM applicants identify themselves as Tribal Applicants and meet the above criteria, the applicant providing the most people with reserved channel NCE service to Tribal Lands will be awarded a construction permit, regardless of the magnitude of the superior service or the populations of the communities of license proposed, if different. If two or more full-service FM applicants identifying themselves as Tribal Applicants each meet the above

47 C.F.R. § 73.7002

Page 2

criteria and propose identical levels of NCE aural service to Tribal Lands, only those applicants shall proceed to be considered together in a point system analysis. In an analysis performed pursuant to paragraph (a) of this section that does not include a Tribal Applicant, a full service FM applicant that will provide the first or second reserved channel noncommercial educational (NCE) aural signal received by at least 10% of the population within the station's 60dBu (1mV/m) service contours will be considered to substantially further fair distribution of service goals and to be superior to mutually exclusive applicants not proposing that level of service, provided that such service to fewer than 2,000 people will be considered insignificant. First service to 2,000 or more people will be considered superior to second service to a population of any size. If only one applicant will provide such first or second service, that applicant will be selected as a threshold matter. If more than one applicant will provide an equivalent level (first or second) of NCE aural service, the size of the population to receive such service from the mutually exclusive applicants will be compared. The applicant providing the most people with the highest level of service will be awarded a construction permit, if it will provide such service to 5,000 or more people than the next best applicant. If none of the applicants in a mutually exclusive group would substantially further fair distribution goals, all applicants will proceed to examination under a point system. If two or more applicants will provide the same level of service to an equivalent number of people (differing by less than 5,000), only those equivalent applicants will be considered together in a point system.

(c) For a period of four years of on-air operations, an applicant receiving a decisive preference pursuant to this section is required to construct and operate technical facilities substantially as proposed and shall not downgrade service to the area on which the preference was based. Additionally, for a period beginning from the award of a construction permit through four years

47 C.F.R. § 73.7002
Page 3

of on-air operations, a Tribal Applicant receiving a decisive preference
pursuant to this section may not:

> (1) Assign or transfer the authorization except to another party that
> qualifies as a Tribal Applicant;

> (2) Change the facility's community of license; or

> (3) Effect a technical change that would cause the facility to provide less
> than full Tribal Coverage.

47 C.F.R. § 73.7003

CODE OF FEDERAL REGULATIONS
TITLE 47. TELECOMMUNICATION
CHAPTER I. FEDERAL COMMUNICATIONS COMMISSION
SUBCHAPTER C. BROADCAST RADIO SERVICES
PART 73. RADIO BROADCAST SERVICES
SUBPART K. APPLICATION AND SELECTION PROCEDURES
FOR RESERVED NONCOMMERCIAL EDUCATIONAL
CHANNELS, AND FOR CERTAIN APPLICATIONS FOR
NONCOMMERCIAL EDUCATIONAL STATIONS ON NON–
RESERVED CHANNELS

**§ 73.7003 Point system selection procedures.**

(a) If timely filed applications for reserved FM channels or reserved TV channels are determined to be mutually exclusive, applications will be processed and assessed points to determine the tentative selectee for the particular channels. The tentative selectee will be the applicant with the highest point total under the procedure set forth in this section, and will be awarded the requested permit if the Commission determines that an award will serve the public interest, convenience, and necessity.

(b) Based on information provided in each application, each applicant will be awarded a predetermined number of points under the criteria listed:

(1) Established local applicant. Three points for local applicants as defined in § 73.7000 who have been local continuously for no fewer than the two years (24 months) immediately prior to application, if the applicant's own governing documents (e.g. by-laws, constitution, or their equivalent) require that such localism be maintained.

47 C.F.R. § 73.7003
Page 2

(2) Local diversity of ownership. Two points for applicants with no attributable interests as defined in § 73.7000, in any other broadcast station or authorized construction permit (comparing radio to radio and television to television) whose principal community (city grade) contour overlaps that of the proposed station, if the applicant's own governing documents (e.g. by-laws, constitution, or their equivalent) require that such diversity be maintained. The principal community (city grade) contour is the 5 mV/m for AM stations, the 3.16 mV/m for FM stations calculated in accordance with § 73.313(c), and the contour identified in § 73.685(a) for TV. Radio applicants will count commercial and noncommercial AM, FM, and FM translator stations other than fill-in stations. Television applicants will count UHF, VHF, and Class A stations.

(3) State-wide network. Two points for an applicant that does not qualify for the credit for local diversity of ownership, if it is:

(i) An entity, public or private, with authority over a minimum of 50 accredited full-time elementary and/or secondary schools within a single state, encompassed by the combined primary service contours of the proposed station and its existing station(s), if the existing station(s) are regularly providing programming to the schools in furtherance of the school curriculum and the proposed station will increase the number of schools it will regularly serve; or

(ii) An accredited public or private institution of higher learning with a minimum of five full time campuses within a single state encompassed by the combined primary service contours of the proposed station and its existing station(s), if the existing station(s) are regularly providing

47 C.F.R. § 73.7003
Page 3

programming to campuses in furtherance of their curriculum and the proposed station will increase the number of campuses it will regularly serve; or

(iii) An organization, public or private, with or without direct authority over schools, that will regularly provide programming for and in coordination with an entity described in paragraph (b)(3)(i) or (ii) of this section for use in the school curriculum.

(iv) No entity may claim both the diversity credit and the state-wide network credit in any particular application.

(4) Technical parameters. One point to the applicant covering the largest geographic area and population with its relevant contour (60 dBu for FM and Grade B for TV), provided that the applicant covers both a ten percent greater area and a ten percent greater population than the applicant with the next best technical proposal. The top applicant will receive two points instead of one point if its technical proposal covers both a 25 percent greater area and 25 percent greater population than the next best technical proposal.)

(c) If the best qualified (highest scoring) two or more applicants have the same point accumulation, the tentative selectee will be determined by a tie-breaker mechanism as follows:

(1) Each applicant's number of attributable existing authorizations (licenses and construction permits, commercial and noncommercial) in the same service (radio or television) nationally, as of the time of application shall be compared, and the applicant with the fewest authorizations will be chosen as tentative selectee. Radio applicants will

47 C.F.R. § 73.7003
Page 4

count commercial and noncommercial AM, FM, and FM translator stations other than fill-in stations. Television applicants will count UHF, VHF, and Class A stations.

(2) If a tie remains after the tie breaker in paragraph (c)(1) of this section, the tentative selectee will be the remaining applicant with the fewest pending new and major change applications in the same service at the time of filing;

(3) If a tie remains after the tie breaker in paragraph (c)(2) of this section, each of the remaining applicants will be identified as a tentative selectee, with the time divided equally among them.

(d) Settlements. At any time during this process, the applicants may advise the Commission that they are negotiating or have reached settlement, and the Commission will withhold further comparative processing for a reasonable period upon such notification. Settlement may include an agreement to share time on the channel voluntarily or other arrangement in compliance with Commission rules. Parties to a settlement shall comply with § 73.3525, limiting any monetary payment to the applicant's reasonable and prudent expenses.

(e) For applications filed after April 21, 2000, an applicant's maximum qualifications are established at the time of application and will be reduced for any post-application changes that negatively affect any evaluation criterion.

(f) For applications filed on or before April 21, 2000, an applicant's maximum qualifications are established as of the relevant date listed in paragraph (f)(1), (2), or (3) of this section. After the relevant date for

47 C.F.R. § 73.7003
Page 5

determining an applicant's maximum points, points will be reduced for any changes that negatively affect any evaluation criterion. Applicants will establish their qualifications according to the following:

(1) If the applicant is in a group for which a "B" cut-off notice issued prior to April 21, 2000 its maximum non-technical qualifications are established as of the date by which applicants must supplement their applications to supply point information, and its maximum technical qualifications are established as of the date of the "B" cut-off notice;

(2) If the applicant is in a group for which an "A" cut-off notice issued prior to April 21, 2000 but for which no "B" cut-off notice issued, its maximum non-technical qualifications are established as of the date by which applicants must supplement their applications to supply point information, and its maximum technical qualifications are established as of April 21, 2000;

(3) If the applicant was neither placed on an "A" cut-off list prior to April 21, 2000 nor filed in response to such an "A" cut-off list, it is subject to competition from applications filed within the first filing window, and its maximum technical and non-technical qualifications will be determined as of the close of the first filing window.

13-1304

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT


**Mary V. Harris Foundation,**
                    **Appellant,**

        **v.**

**Federal Communications Commission,**
                    **Appellee.**


## <u>CERTIFICATE OF SERVICE</u>

I, Matthew J. Dunne, hereby certify that on April 30, 2014, I electronically filed the foregoing Brief for Appellee with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Some of the participants in the case, denoted with asterisks below, are not CM/ECF users.  I certify further that I have directed that copies of the foregoing document be mailed by First-Class Mail to those persons, unless another attorney at the same mailing address is receiving electronic service.


Donald E. Martin, P.C.               Denise B. Moline, Esq.
P.O. Box 8433                        358 Pines Blvd.
Falls Church, Virginia 22041         Lake Villa, IL 60046-6600
*Counsel for: Mary V. Harris*        *Counsel for:  Holy Family*
  *Foundation*                          *Communications, Inc.*




/s/ Matthew J. Dunne